# EXHIBIT A

| DISTRICT COURT<br>CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: November 8, 2019 3:56 PM<br>FILING ID: 7F008BD83E941<br>CASE NUMBER: 2019CV34297 |
|---|---|
| **Plaintiff:**<br><br>Email on Acid, LLC<br><br>v.<br><br>**Defendant:**<br><br>250ok, Inc., formerly 250ok LLC | |
| | ▲ **COURT USE ONLY** ▲ |
| **Attorneys for Plaintiff:**<br><br>Name:     Zachary C. Garthe, #46741<br>            Reid J. Allred, #37934<br>Address:  CAMBRIDGE LAW LLC<br>            4610 S. Ulster St.<br>            Suite 150<br>            Denver, CO  80237<br>Phone:   (303) 488-3338<br>FAX:      (303) 488-3337<br>E-mail:   zac@cambridgelawcolorado.com<br>            reid@cambridgelawcolorado.com | Case Number:<br><br>Div.: |
| **COMPLAINT AND JURY DEMAND** | |

## INTRODUCTION

1.    Email on Acid, LLC ("**Email on Acid**") is an award-winning[1] Denver technology firm serving clients globally and employing dozens of Colorado citizens over the past decade. Given the risk of software theft in the Digital Age, Email on Acid protects its proprietary services with strict contracts seeking to prevent theft or abuse. Unfortunately, despite these protections, Defendant stole Email on Acid's intellectual property anyway. After licensing Email on Acid's technology and agreeing not to create a competing product, Defendant abused this access to create its own rip-off version of the product, marketed itself as a competitor to Email on Acid, and has attempted to poach Email on Acid's customers—all using Email and Acid's intellectual property.

---

[1] In June 2019, Bank of America Merrill Lynch named Email on Acid as a recipient of the Colorado Companies to Watch Award.

This form of corporate espionage is a textbook example of the harm sought to be prevented not only by Email on Acid's licensing agreement, but also by Colorado's Uniform Trade Secret Act.

## PARTIES

2.      Plaintiff Email on Acid is a limited liability company organized under the laws of Colorado with its principle place of business located at 5500 Greenwood Plaza Boulevard, Suite 220, Greenwood Village, CO 80111.

3.      Defendant 250ok, Inc., is a corporation organized under the laws of Delaware as of September 18, 2017. Prior to this date, Defendant operated as a limited liability company organized under the laws of Indiana. At all relevant times, Defendant's principle place of business has been located at 9247 N. Meridian Street, Suite 301, Indianapolis, IN, 46260.

## JURISDICTION AND VENUE

4.      This action arises from and is related to a contract between the parties. Jurisdiction in Colorado is proper not only because Defendant transacts business in this state pursuant to C.R.S. § 13-1-124 but also because the parties contractually agreed to venue in and jurisdiction of this Court. The contract provides:

> 17.2 Governing Law - This Agreement, and any disputes arising from or relating to the interpretation thereof, shall be governed by and construed under the state of Colorado law as such law applies to agreements between Colorado residents entered into and to be performed within Colorado by two residents thereof and without reference to its conflict of laws principles or the United Nations Conventions for the International Sale of Goods. Except to the extent otherwise determined by Email on Acid, any action or proceeding arising from or relating to this Agreement must be brought in a federal court or state court in Colorado and each party irrevocably submits to the jurisdiction and venue of any such court in any such action or proceeding.

5.      Venue is proper based on the contract provision above and also pursuant to C.R.C.P. 98(c) because the harm alleged herein occurred in Colorado.

## GENERAL ALLEGATIONS

### *Email on Acid develops a proprietary service to provide quality assurance for email marketing.*

6.      Email marketing is vital to any brand, but it can be risky. An email is final; once it is sent, you cannot get it back. With the advent of mobile technology in the 2000s, email platforms became increasingly complex across multiple versions of operating systems on various generations of devices from several providers. This complexity presented marketers with a serious problem

because emails sent to one platform might not load correctly or function properly on another platform. How could businesses ensure their marketing emails loaded accurately to avoid being swiped into the trash? Enter Email on Acid.

7.     In 2009, Email on Acid launched its email quality assurance software-as-a-service. Email on Acid's propriety service (the "**Email Previews Service**") allows marketers to preview how their emails will look in email platforms (e.g., Gmail, Yahoo, AOL) on mobile, desktop, and web-based applications. Each email platform displays content differently and marketers rely on Email on Acid's services, which provide screenshots of how the email is rendered, to maintain their brand integrity. Email on Acid's Email Previews Service maintains applications that interface with each email-platform provider so its clients do not have to own each device or an account in each platform. The service also provides the ability to ensure all images, text, hyperlinks, etc. function as intended across all email platforms.

8.     Initially, Email on Acid only provided its Email Previews Service directly to end-users of the service, but later it developed a "white-label" version that could be used by a licensee to provide email quality assurance to its third-party customers. To utilize the white-label platform, a company would license the use of Email on Acid's application program interface ("**API**") for the Email Previews Service.

### Defendant licenses Email on Acid's Email Previews Service.

9.     Defendant provides email marketing support through tools that assist in analytics and deliverability. Its clients include email marketing corporations such as Marketo and SendGrid, as well as brands such as Draft Kings and eharmony.

10.     In 2015, Defendant purchased the white-label version of the Email Previews Service for use with its existing clients. Defendant, through its Chief Technology Officer, Ryan Pfenniger, executed an Email on Acid API License Agreement (the "**License Agreement**") on August 3, 2015. The License Agreement is attached hereto as **Exhibit 1**.

11.     The License Agreement was (and is) designed to protect Email on Acid's intellectual property underlying its Email Previews Service and prohibits licensees from creating a competing product.

12.     Specifically, the License Agreement restricts use of Email on Acid's intellectual property to "the limited use and access rights described in this Agreement." (Ex. 1., Section 15). The License Agreement also prohibits use of confidential information, including technical information, "except as expressly permitted in this Agreement." (*Id.*, Section 16).

13.     The permitted uses explicitly prescribe that "Licensee [shall not] build or create any product that directly competes with [Email on Acid's] Email Previews service." (*Id*., Section 13(e).)

14.     The License Agreement is a valid and enforceable agreement, and Defendant was fully aware of its restrictions, including the prohibition on developing a competing product.

15.     At all times under the License Agreement, Email on Acid fully performed its obligations, and the two companies carried on business, seemingly without issue, for years.

***Defendant threatens to breach the License Agreement as a tactic to drive down Email on Acid's acquisition price.***

16.     In 2018, problems began. Recognizing the value of the Email Previews Service, during one or more phone calls in early 2018, Defendant's Chief Executive Office, Greg Kraios, threatened Email on Acid's Chief Executive Office and Co-Founder, John Thies, that Defendant would either acquire Email on Acid or rip-off the Email Previews Service (despite the prohibition against doing so in the License Agreement).

17.     Soon after, in May 2018, at the Email Innovations Summit in Las Vegas, Nevada, Mr. Kraios repeated the threat to Mr. Thies in person, but elevated his threat and suggested that Defendant could start developing the competitive product. Mr. Thies told Mr. Kraios that he was not interested in selling Email on Acid, and advised Mr. Kraios against developing the competing product.

18.     After making these repeated threats, Mr. Kraios then approached Mr. Thies in June 2018 while attending another conference in Amsterdam, where Defendant again offered to acquire Email on Acid.

19.     At the time, Email on Acid believed that Mr. Kraios was making baseless threats (threats it was precluded from acting on by the License Agreement) in an attempt to drive down Email on Acid's acquisition price.

***Defendant, willfully and with wanton disregard, breaches the License Agreement.***

20.     Despite its threats, Defendant continued to license and use Email on Acid's API pursuant to the License Agreement.

21.     A year later, in June 2019, Email on Acid became aware of Defendant running online advertisements on Google.com, in which Defendant marketed its company and services as a competitor to Email on Acid:

22.     At this time, Email on Acid became aware that Defendant had developed and was offering its own email-previews service, as depicted on its website (https://250ok.com/tour/design/):



23.     By developing a directly competing email-previews service, Defendant violated the terms of use of the intellectual property licensed under the License Agreement.

***Defendant misappropriates Email on Acid's confidential trade secrets in order to develop a directly competing rip-off email-previews service.***

24.     On information and belief, at some time beginning in 2017, Defendant began development of its own service to compete directly with Email on Acid's Email Previews Service. At all times during this development, Defendant had access to Email on Acid's proprietary API (via the License Agreement) and continued to use this API. On information and belief, Defendant used Email on Acid's API to perform benchmarking tests on its own product development in order to gain unfair competitive advantage over Email on Acid's directly competing service.

25.     When a licensee operates Email on Acid's proprietary API for the Email Previews Service under the License Agreement, the licensee is presented with a wealth of technical information on the performance and operation of the Email Previews Service. This technical information includes screenshots of how an email will look in each of the supported email platforms, a detailed outline of the service's performance in producing said screenshots, latency of the API performance, screenshot failure rates, and benchmarking information—meaning the licensee could use automation to aggregate the performance of the Email Previews Service and compare it to a competitive product providing significant competitive advantage over those trying to develop a competitive product without API access.

26.     Moreover, a licensee also has access to Email on Acid's proprietary technical design information in order to interface with Email on Acid's API. This access gave Defendant an unfair advantage in the marketplace specifically against Email on Acid's own clients. Each of Email of Acid's clients must develop an interface to process data from Email on Acid's API, which often

takes significant time and cost to develop. When a licensee, such as Defendant, develops a competing email-previews service it can (and, on information and belief, does) mimic Email on Acid's technical design to integrate with the interface developed by Email on Acid's existing clients. Doing so makes the cost negligible for a client to switch from Email on Acid's service to Defendant's service.

27.    All of this technical information is highly sensitive, constitutes Email on Acid's proprietary trade secrets and is not available to anyone who does not have a signed License Agreement with Email on Acid.

28.    Email on Acid takes reasonable steps to protect disclosure of the technical information presented from the Email Previews Service because this information is the most important competitive information for creating and comparing competing email-previews services. All access to the functionality and design of Email on Acid's API is protected by keys and passwords which prevents anyone without a key and password from having access to Email on Acid's trade-secret technical information. Even internally, access to this technical information is limited to those that require access to perform customer support, business analytics, system updates, and system maintenance. And all employees and contractors sign agreements with confidentiality provisions to protect against abuse or disclosure.

29.    Externally, only licensees bound by an Email on Acid API License Agreement (like the License Agreement at issue) have access to the API and resulting trade-secret technical information, and all these licensees agree to confidentiality provisions and to protect Email on Acid's intellectual property (as Defendant did).

30.    Moreover, theft of the trade secrets and other intellectual property through abuse of the license is exactly the harm contemplated and sought to be prevented by the License Agreement. For this reason, the License Agreement includes detailed provisions as to permitted use of intellectual property, provisions allowing for equitable relief in recognition of the irreparable harm such a breach would cause, and indemnity against a licensee's abuse of the API.

31.    Indeed, the technical information resulting from operation of Email on Acid's API is some of the most valuable trade secrets owned by Email on Acid, as it details the resulting functionality of the Email Previews Service—the backbone service of the company. The functionality of the Email Previews Service took over 10 years to develop. The Email Previews Service is Email on Acids' core product offering, which it is constantly updating and upgrading. Email on Acid has a dedicated team of ten full-time employees—product managers, engineers, and support specialists—that manage and maintain the service daily. This product is incredibly difficult to maintain. Some vendors (e.g., Gmail) do not notify Email on Acid of changes they make in their platforms, requiring constant experimenting and adjustment of how the application interfaces with these platforms. The immense challenge involved in developing this service is one of the main reasons why there were only two companies in the world providing this service: Email on Acid and its competitor (Litmus). But now Defendant has stolen Email on Acid's trade-secret technical information to create its own service to unfairly compete for Email on Acid's clients.

32.     If it were not for Defendant's abuse of the license to misappropriate these trade secrets, Defendant could not have independently discovered the information. The only means of access it had to this information was through use of Email on Acid's API.

33.     Abuse of this technical information—misappropriated by using a bad-faith license—is extremely harmful to Email on Acid; perhaps an existential threat. It allows Defendant to unfairly outcompete Email on Acid in both product quality and price. By benchmarking against Email on Acid's Email Previews Service during development of its competitor product, Defendant can (and, on information and belief, did) continue to refine its product until it could validate that its service matched or out-competed Email on Acid's. Moreover, on information and belief, Defendant can now bundle its wrongly acquired email previews service with its existing services free-of-charge, as Defendant is no longer paying Email on Acid's license. Finally, Defendant can virtually eliminate the cost for Email on Acid's clients to switch from Email on Acid's service over to Defendants (which no other competitor can do). The competitive advantage provided to Defendant immeasurable, allowing them to outcompete future clients and poach away existing ones.

### Email on Acid terminates the License Agreement to protect itself.

34.     After learning of Defendant's breach of the License Agreement (and suspected misappropriation of trade secrets), Email on Acid formally provided notice of termination of the License Agreement on July 2, 2019, which became effective August 1, 2019. In this notice, Mr. Thies stated:

> It's unfortunate that I have to provide this notice but this email is a formal notification of Email on Acid's intent to terminate the API License Agreement with 250ok, pursuant to section 8 of the API Agreement. It is not something that I want to do but is in the best interests of EOA given that 250ok has recently released a product that is in direct competition with our email rendering services. I hope that you understand given that this has created a conflict of interest between our organizations.

35.     In response, on July 3, Mr. Kraios conceded that it directly competes with Email on Acid, saying "We completely understand, and although we technically compete, I still think there might be ways for us to do some cool things together."

### Defendant attempts to steal Email on Acid's clients.

36.     On information and belief, before and after termination of the License Agreement, Defendant has actively sought to poach Email on Acid's clients away from its Email Previews Service and over to Defendant's competing email-previews service. As a result of Defendant's activities, Email on Acid has been forced to lower its prices for at least one client, causing significant damage to Email on Acid that could not have occurred but for Defendant's wrongful actions.

## FIRST CLAIM FOR RELIEF

### Breach of Contract
### (Breach of the License Agreement)

37.     Email on Acid realleges and incorporates all allegations above.

38.     Email on Acid and Defendant entered into a valid and enforceable contract, the License Agreement, on August 3, 2015.

39.     At all times during the existence of the contract between the parties, Email on Acid fully performed all obligations under the License Agreement.

40.     The License Agreement placed heavy restrictions on Defendant's use of Email on Acid's intellectual property, including its API (Ex. 1, Section 15) and confidential technical information (*Id.*, Section 16). The permitted uses of Email on Acid's intellectual property excluded Defendant from building or creating any product that directly competes with Email on Acid's Email Previews Service. (*Id*., Section 13(e)).

41.     On information and belief, in 2017, while subject to the License Agreement and unbeknownst to Email on Acid, Defendant began building its own email-previews service to directly compete with Email on Acid's Email Previews Service.

42.     In 2018, Defendant made numerous threats to intentionally breach the License Agreement and build a competing email-previews service.

43.     In June 2019, Email on Acid learned that Defendant had in fact built a competing email-previews service, which it began marketing as a direct competitor to Email on Acid with advertisements stating, "Email On Acid Alternative | 250ok". On information and belief, Defendant used Email on Acid's API in order to assist in building this competing product. Defendant breached at least Sections 15 and 16 of the License Agreement.

44.     In view of Defendant's breach of the contract, Email on Acid terminated the License Agreement in August 2019. The License Agreement provides for the following survival provision (emphasis added):

> **17.8 Survival** - In addition to any other terms that, by their nature survive expiration or termination, the following provisions will survive any expiration or termination of this Agreement: … <u>7 (Indemnity); 15 (Intellectual Property); 16 (Confidentiality); and 17 (Misc.).</u>

45.     Section 7 states as follows (emphasis added):

> **7. INDEMNITY** - … Licensee shall indemnify and hold harmless Email on Acid from any and all claims, damages, liabilities, costs and fees (including reasonable attorneys' fees) <u>arising from Licensee's use of the API.</u>

8

46.     Section 15 states as follows (emphasis added):

**15. INTELLECTUAL PROPERTY** - <u>Other than the limited use and access rights and licenses expressly set forth in this Agreement, Email on Acid reserves all right, title and interest (including all intellectual property and proprietary rights) in and to: (a) the API services;</u> (b) the Marks; and (c) any other technology and software that we provide or use to provide the Email on Acid API. <u>The Licensee does not,</u> by virtue of this Agreement or otherwise, <u>acquire any</u> ownership interest or <u>rights in the API Services,</u> the Marks, or other technology and software (including third party technology and software), <u>except for the limited use and access rights described in this Agreement</u>.

47.     Section 16.1 states as follows (emphasis added):

**16. CONFIDENTIALITY**

16.1 <u>Each Party acknowledges that the other Party may disclose certain technical, financial, or business information</u> that such other Party considers to be confidential and proprietary, including, without limitation, information regarding existing and future technical, business and marketing plans and product strategies, finances, and the identity of actual and potential customers and suppliers ("<u>Confidential Information"), and that the unauthorized use</u> or disclosure <u>of any such Confidential Information</u> by the Party using such Confidential Information (the "Receiving Party") <u>would cause irreparable financial and other damages</u> to the disclosing Party (the "Disclosing Party"). <u>The Receiving Party agrees not to</u> disclose to any third party, <u>use or duplicate any Confidential Information</u> of the Disclosing Party, <u>except as expressly permitted in this Agreement</u>. …

48.     Section 13(e) states as follows:

**13.) PERMITTED USES**

e. At no time under this agreement shall the Licensee [(Defendant)] build or create any product that directly competes with E[mail on Acid]'s Email Previews service.

49.     Section 17.2 states as follows (emphasis added):

**17. MISCELLANEOUS**

**17.12 Equitable Relief** - Each of the Parties acknowledges and agrees that a <u>breach or threatened breach</u> by a Party of the provisions of Sections 2 ([Proprietary] Rights); 15 (Intellectual Property) and/or 16 (Confidentiality) <u>will cause irreparable damage</u> to the non-breaching Party <u>and</u> in the event of such a breach, <u>the non-breaching Party will have,</u> in addition to any other rights it may have, <u>the right to seek equitable relief,</u> including injunctive

relief <u>without an obligation to prove actual damages, post bond or any other security</u>.

50.     Defendant willfully breached the License Agreement. As a result of Defendant's breach, it has caused Email on Acid to suffer irreparable harm and actual damages to be proven at trial.

51.     Because Defendant's use of Email on Acid's API caused these damages, Defendant must indemnify and hold harmless Email on Acid, including by paying its reasonable attorney fees.

52.     Email on Acid is entitled to equitable relief, including both preliminary and permanent injunctive relief, without an obligation to prove actual damages or post a bond.

## SECOND CLAIM FOR RELIEF

### Unjust Enrichment
### (Brought in the alternative to the First Claim For Relief)

53.     Email on Acid realleges and incorporates all allegations above.

54.     Defendant received the benefit of access to Email on Acid's technical information regarding the performance and operation of its Email Previews Services product and API by entering into the License Agreement. This access allowed it to develop a competing email-previews product to directly unfairly compete with Email on Acid.

55.     Defendant benefited from the ability to benchmark its competing email-previews product during development against Email on Acid's product and benefited from Email on Acid's technical design structure in order to interoperate with the API interfaces of Email on Acid's clients. Moreover, even if Defendant had not benchmarked or mimicked Email on Acid's technical design, by having access to Email on Acid's API and resulting technical information while simultaneously directly competing with Email on Acid, Defendant had an unjust benefit of competitive market information.

56.     Defendant's benefit was derived at Email on Acid's expense because Email on Acid has been damaged by an amount to be proven at trial as a result of Defendant's unfair competitive advantage though misappropriated access to Email on Acid's API.

57.     Under the circumstances, it would be unfair for Defendant to retain this benefit at the expense of Email on Acid. Email on Acid seeks all relief deemed equitable by the Court.

**THIRD CLAIM FOR RELIEF**

**Misappropriate of Trade Secret**
**(Violation of Colorado Uniform Trade Secrets Act, C.R.S. § 7-74-101 *et seq.*)**

58.     Email on Acid realleges and incorporates all allegations above.

59.     Defendant has misappropriated Email on Acid's trade secrets through improper means.

60.     Email on Acid's performance and operational technical information provided through use of its API qualifies as trade secret under the Colorado Uniform Trade Secrets Act ("**CUTSA**"). (*See* C.R.S. § 7-74-102(4)).

61.     This information is not publicly known, and Email on Acid has taken reasonable efforts to maintain its secrecy. All persons and entities with access to this information are subject to confidentiality obligations, and access is controlled with key and password protections. This information is not known outside of Email on Acid's business and cannot be derived from public information. It is extremely costly, perhaps impossible, to discover without having access to Email on Acid's API.

62.     This trade secret information has independent economic value. It allows a competitor to develop a competitive product that eliminates any cost for a client to switch from Email on Acid's platform to the competitor platform. Indeed, because the Email Previews Service is Email on Acid's core product, its secret technical information is perhaps the most valuable information possessed by Email on Acid.

63.     Defendant misappropriated Email on Acid's trade secrets under CUTSA. (See C.R.S. § 7-74-102(2)). Defendant stole and used Email on Acid's trade secrets without express or implied consent through improper means, including at least by theft and espionage, and possibly other improper means. Defendant also used Email on Acid's trade secrets when it knew that use of these trade secrets were limited, pursuant to the License Agreement.

64.     Defendant used improper means under CUTSA to misappropriate Email on Acid's trade secrets. (See C.R.S. § 7-74-102(1)). Defendant breached its duties under the License Agreement, engaged theft and corporate espionage through electronic and other means, and used other unlawful means to use Email on Acid's API to develop its own competing email-preview product.

65.     Defendant knew that it was subject to the restrictions of the License Agreement, but nevertheless willfully, wantonly, and maliciously misappropriated Email on Acid's most sensitive, secret, valuable trade secrets in order to unfairly compete with Email on Acid, in part as a means of devaluing the company prior to take-over.

66.     Email on Acid is entitled to damages to be proven at trial, including exemplary damages, and attorney fees.

## PRAYER FOR RELIEF

WHEREFORE, Email on Acid prays for entry of judgment in its favor and against Defendant and requests that the Court provide the following relief:

A.    An award of damages for all harm caused to Email on Acid by Defendant through its breach of the License Agreement, including an indemnification against all damages caused by Defendant's use of the API, including an award of reasonable attorney fees;

B.    In the alternative to damages caused by Defendant's breach of the License Agreement, an award in equity for restitution for all harm caused to Email on Acid by Defendant, including unjust enrichment of Defendant by Email on Acid, in an amount to be proven at trial;

C.    An award of damages for all harm caused to Email on Acid by Defendant through misappropriation of Email on Acid's trade secrets in an amount to be proven at trial, including exemplary damages and attorney fees;

D.    An award of preliminary and permanent injunctive relief enjoining Defendant from continued breach of the License Agreement and misappropriation of Email on Acid's trade secrets by ordering Defendant to stop offering, selling, or providing its email-previews product;

E.    An award of exemplary damages;

F.    An award of costs and attorney fees;

G.    An award of prejudgment interest; and

H.    All other relief the Court deems proper and just.

## JURY DEMAND

Email on Acid respectfully demands that all claims and issues triable to a jury be so tried.

Respectfully submitted this 8th day of November, 2019.

CAMBRIDGE LAW LLC
By: *s/ Zachary C. Garthe*
Zachary C. Garthe, # 46741

ATTORNEYS FOR PLAINTIFF EMAIL ON ACID, LLC

DATE FILED: November 8, 2019 3:56 PM
FILING ID: 7F008BD83E941
CASE NUMBER: 2019CV34297

**EXHIBIT 1**

**Email on Acid API License Agreement, signed by Defendant**

# EMAIL ON ACID API LICENSE AGREEMENT

This API License Agreement is made between ___250ok LLC_____herein
after referred to as ("**Licensee**"), with a principal place of business at
___9247 N Meridian Street, Suite 100, Indianapolis, IN 46260_____and
Email on Acid LLC ("EOA" or "Email on Acid") with a principal place of business at 5670 Greenwood
Plaza BLVD Suite 412, Greenwood, CO 80111, dated as of __8_/_3_/__2015__ (the "**Effective Date**").

BY INTERACTING IN ANY WAY WITH THE EMAIL ON ACID API, INCLUDING, BUT NOT LIMITED TO
REQUESTING CREDENTIALS OR MAKING API CALLS, THE LICENSEE UNCONDITIONALLY CONSENTS AND
AGREES TO BE BOUND BY AND A PARTY TO THE FOLLOWING TERMS AND CONDITIONS:

**1. GRANT OF LICENSE** - Subject to your ("Licensee's") full compliance with all of the terms and
conditions of this API Agreement ("Agreement"), Email on Acid, LLC ("Email on Acid") grants Licensee a
non-exclusive, revocable, nonsublicensable, nontransferable license to download and use the Email on
Acid application program interface and other materials provided by Email on Acid (collectively, "API")
to develop, reproduce and distribute applications that interoperate with EmailonAcid.com.  Licensee
may not install or use the API for any other purpose without Email on Acid's prior written consent.

Licensee shall not use the API in connection with or to promote any products, services, or materials
that constitute, promote or are used primarily for the purpose of dealing in: spyware, adware, or other
malicious programs or code, counterfeit goods, items subject to U.S. embargo, unsolicited mass
distribution of email ("spam"), multi-level marketing proposals, hate materials,
hacking/surveillance/interception/descrambling equipment, libelous, defamatory, obscene,
pornographic, abusive or otherwise offensive content, prostitution, body parts and bodily fluids, stolen
products and items used for theft, fireworks, explosives, and hazardous materials, government IDs,
police items, gambling, professional services regulated by state licensing regimes, non-transferable
items such as airline tickets or event tickets, weapons and accessories.

**2. PROPRIETARY RIGHTS** - As between Email on Acid and Licensee, the API and all intellectual property
rights in and to the API are and shall at all times remain the sole and exclusive property of Email on
Acid and are protected by applicable intellectual property laws and treaties.

**3. OTHER RESTRICTIONS** - Except as expressly and unambiguously authorized under this Agreement,
Licensee may not (i) copy, rent, lease, sell, transfer, assign, sublicense, disassemble, reverse engineer
or decompile (except to the limited extent expressly authorized by applicable statutory law), modify or
alter any part of the API; (ii) otherwise use the API on behalf of any third party.

 **4. WARRANTY DISCLAIMER** - THE APIs ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND.
EXCEPT TO THE EXTENT REQUIRED BY APPLICABLE LAW, EMAIL ON ACID AND ITS VENDORS EACH
DISCLAIM ALL WARRANTIES, WHETHER EXPRESS, IMPLIED OR STATUTORY, REGARDING THE API,
INCLUDING WITHOUT LIMITATION ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY,
ACCURACY, RESULTS OF USE, RELIABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, INTERFERENCE
WITH QUIET ENJOYMENT, AND NON-INFRINGEMENT OF THIRD-PARTY RIGHTS. FURTHER, EMAIL ON

Exhibit 1

ACID DISCLAIMS ANY WARRANTY THAT LICENSEE'S USE OF THE API WILL BE UNINTERRUPTED OR ERROR FREE.

**5. CUSTOMER SUPPORT** - For purposes of this agreement, "Support" means consultative guidance provided by Email on Acid pertaining to the installation and usage of the application programming interface.

Email on Acid _agrees_ to support the Licensee regarding any and all issues that may arise from the technical integration, disruption in service, or exceedingly slow Acid test processing times - standard processing times are between one and five minutes. Greater detail outlined in **Exhibit B**.

Email on Acid _agrees_ to support Licensee customers who have reported _valid_ Acid test discrepancies. For purposes of this agreement a "discrepancy" is any slight variance from the email client simulations and the actual result in any or all of the email client applications that are supported in the API.  Or the "discrepancy" is an overlap of content caused by our screenshot software piecing together the individual screenshots. Email on Acid retains the right to choose which discrepancies will be resolved.

Email on Acid _does not agree_ to provide the Licensee or any of its customers with ongoing support such as business consulting or other professional internet services including, but not limited to email design, email templates, web design, XHTML, HTML, CSS, CGI, or any other form of web development services. This includes time spent communicating with the Licensee or any of its customers and any time spent performing associated research, duplicating customer problems, acquiring knowledge of customer's third party product or performing any other task associated with providing support to the Licensee or its customers.

6. **LIABILITY LIMITATION** - REGARDLESS OF WHETHER ANY REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE OR OTHERWISE, AND EXCEPT FOR BODILY INJURY, IN NO EVENT WILL EMAIL ON ACID OR ITS VENDORS, BE LIABLE TO LICENSEE OR TO ANY THIRD PARTY UNDER ANY TORT, CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY FOR ANY LOST PROFITS, LOST OR CORRUPTED DATA, COMPUTER FAILURE OR MALFUNCTION, INTERRUPTION OF BUSINESS, OR OTHER SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND ARISING OUT OF THE USE OR INABILITY TO USE THE API, EVEN IF EMAIL ON ACID HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGES AND WHETHER OR NOT SUCH LOSS OR DAMAGES ARE FORESEEABLE. ANY CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT MUST BE BROUGHT WITHIN ONE (1) YEAR AFTER THE OCCURRENCE OF THE EVENT GIVING RISE TO SUCH CLAIM. IN ADDITION, EMAIL ON ACID DISCLAIMS ALL LIABILITY OF ANY KIND FOR EACH OF THEIR SUPPORTED EMAIL CLIENT APPLICATION PROVIDERS.

**7. INDEMNITY** - Licensee agrees that Email on Acid shall have no liability whatsoever for any use Licensee makes of the API. Licensee shall indemnify and hold harmless Email on Acid from any and all claims, damages, liabilities, costs and fees (including reasonable attorneys' fees) arising from Licensee's use of the API.

**8. TERM AND TERMINATION** - This Agreement shall continue until terminated as set forth in this Section. Either party may terminate this Agreement at any time, for any reason, or for no reason including, but not limited to, if Licensee violates any provision of this Agreement. Any termination of

Exhibit 1

this Agreement shall also terminate the license granted hereunder. Requests to terminate this Agreement must be made in writing, to Email on Acid, with a minimum notice of thirty (30) days. Upon termination of this Agreement for any reason, Licensee shall destroy and remove from all computers, hard drives, networks, and other storage media all copies of the API, and shall so certify to Email on Acid that such actions have occurred. Email on Acid shall have the rights to any remaining support or API service fees up until the date of termination.  Upon termination of this agreement, the Licensee agrees to make payments on any remaining invoices for Acid Test results.

**9. EXPORT CONTROLS** - Licensee shall comply with all export laws and restrictions and regulations of the Department of Commerce, the United States Department of Treasury Office of Foreign Assets Control ("OFAC"), or other United States or foreign agency or authority, and Licensee shall not export, or allow the export or re-export of the API in violation of any such restrictions, laws or regulations. By downloading or using the API, Licensee agrees to the foregoing and represents and warrants that Licensee is not located in, under the control of, or a national or resident of any restricted country.

**10. DOWNTIME AND SERVICE SUSPENSIONS** - The Licensee acknowledges that: (a) access to and use of the Email on Acid API may be suspended for the duration of any unanticipated or unscheduled downtime or unavailability of any portion or all of the API for any reason, including as a result of power outages, system failures or other interruptions; and (b) Email on Acid shall also be entitled, without any liability to the Licensee, to suspend access to any portion or all of the API at any time, on a service-wide basis for; (a) scheduled downtime to permit us to conduct maintenance or make modifications to any service; or (b) in the event of a virus attack, other attack on the API, or in an event that we determine, in our sole discretion, may create a risk to the applicable service, to the Licensee or to any of our other customers if the service were not suspended; or (c) in the event that we determine that any service is prohibited by law or we otherwise determine that it is necessary or prudent to do so for legal or regulatory reasons (collectively, "Service Suspensions"). Email on Acid shall have no liability whatsoever for any damages, liabilities, losses (including any loss of data or profits) or any other consequences that the Licensee may incur as a result of any Service Suspension. To the extent we are able, we will endeavor to provide the Licensee with email notice of any Service Suspension but shall have no liability for the manner in which we may do so or if we fail to do so.

**11. SERVICE LEVEL AGREEMENT** - Email on Acid agrees to meet or exceed the service level requirements set forth in **Exhibit A**.

**12. PAYMENT TERMS**

a. Email on Acid shall submit invoices for all services rendered and expenses incurred on the 1st of each month.  Licensee shall pay Email on Acid within *30* days after receipt of each invoice.  Any expenses incurred by Email on Acid in connection with the performance of services under this Agreement are to be paid by Client within one invoice period.

12.2 **Payment Methods**  Credit Card is preferred.  Checks are accepted on a per-case basis and must be negotiated before this contract is signed, otherwise it is required that payment must be submitted by Credit Card.  Wire-transfers **may** be considered on a per-case basis with an additional charge of $50.00 US per transaction.

Exhibit 1

a.  If Licensee elects to absorb the cost of Acid Test results as a value added service to their members, they would fall under the Email on Acid "**White-label RESTful API** " and must pay for access to the Live Acid Test Server according to the amount shown in **Exibit B** based on the number of Events ran in each month.

b.  The pricing chart is guaranteed for 12 months following the date this agreement is signed.   The Licensee agrees that beyond the 12 month initial period, they may be subject to increase in price, for the following 12 month period, based on increased usage.  If the Licensee surpasses the maximum number of events listed in the Exibit B, the Licensee understands API contract may be suspended and/or terminated.  This is done in the interest of both parties as a new contract and pricing terms will need to be agreed to.

Licensee is required under this Agreement to disclose their plans for the Email on Acid API implementation and their methods by which they charge their customers.  If, for any reason the Licensee should change their business model the Licensee agrees to notify Email on Acid in writing, email or written letter, and sign an updated contract before releasing any Acid Test pricing modifications to their customers.  Under this contract, changes to the Licensee customer billing structure with respect to Acid Tests without prior notification to Email on Acid is strictly prohibited and Email on Acid retains the right to discontinue the API service at any time.

Licensee also understands that if they change the way they bill their customers for Acid Test results, they may fall into a different Email on Acid API payment program and their monthly invoices from Email on Acid will reflect this change in service.

13.) **PERMITTED USES**

**a.** Licensee may write or develop software, web sites, or other online services or technology that interfaces with the Email on Acid API.  The API includes machine images containing software application screen shots, data and associated configuration settings.  Licensee acknowledges that Email on Acid may change, deprecate or republish API calls or features from time to time, and that it is the responsibility of the Licensee to ensure that calls to the API are compatible. The Licensee further acknowledges that Email on Acid may change or remove features or functionality of the API at any time.

**b.** Licensee may use Email Content for or from its end users in accordance with the terms of this Agreement. "Email Content" means any machine images or data that get sent through the Email on Acid API for testing.  The Licensee is responsible for all terms and conditions applicable to said Email Content.

c. Licensee may not interfere or attempt to interfere in any manner with the functionality or web services provided through the Email on Acid API.

Exhibit 1

d. Licensee may not compile or use the Email on Acid data results or any other information obtained through the API for the purpose of spamming, unsolicited contacting of sellers or customers, or other impermissible advertising, marketing or other activities, including, without limitation, any activities that violate anti-spamming laws and regulations.

e. At no time under this agreement shall the Licensee build or create any product that directly competes with EOA's Email Previews service.

**14. SECURITY** - At Email on Acid, we strive to keep Licensee content secure, but cannot guarantee that we will be successful at doing so, given the nature of the Internet. Accordingly, the Licensee acknowledges that they bear sole responsibility for adequate security, protection and backup of their content and internet applications. Email on Acid strongly encourages the Licensee, where available and appropriate, to (a) use encryption technology to protect content from unauthorized access, (b) routinely archive content, and (c) keep your applications or software that you use or run with our API current with the latest security patches and updates. Email on Acid will have no liability to the Licensee for any unauthorized access or use, corruption, deletion, destruction or loss of any Licensee content or applications.

**15. INTELLECTUAL PROPERTY** - Other than the limited use and access rights and licenses expressly set forth in this Agreement, Email on Acid reserves all right, title and interest (including all intellectual property and proprietary rights) in and to: (a) the API services; (b) the Marks; and (c) any other technology and software that we provide or use to provide the Email on Acid API. The Licensee does not, by virtue of this Agreement or otherwise, acquire any ownership interest or rights in the API Services, the Marks, or other technology and software (including third party technology and software), except for the limited use and access rights described in this Agreement.

**16. CONFIDENTIALITY**

**16.1** Each Party acknowledges that the other Party may disclose certain technical, financial, or business information that such other Party considers to be confidential and proprietary, including, without limitation, information regarding existing and future technical, business and marketing plans and product strategies, finances, and the identity of actual and potential customers and suppliers ("Confidential Information"), and that the unauthorized use or disclosure of any such Confidential Information by the Party using such Confidential Information (the "Receiving Party") would cause irreparable financial and other damages to the disclosing Party (the "Disclosing Party"). The Receiving Party agrees not to disclose to any third party, use or duplicate any Confidential Information of the Disclosing Party, except as expressly permitted in this Agreement. The Receiving Party will limit the disclosure of all such Confidential Information to those of its employees and agents who have a need to know such Confidential Information for the performance of this Agreement. The Receiving Party further agrees to take all reasonable measures to maintain the confidence of all such Confidential Information in its possession or control, which measures will in no event, be less than the measures that the Receiving Party takes to protect its own confidential and proprietary information of similar importance.

**16.2** Confidential Information will not include information that: (a) is in or enters the public domain without breach of this Agreement; or (b) the Receiving Party lawfully receives from a third

Exhibit 1

party without restriction on disclosure and without breach of a nondisclosure obligation; or (c) the Receiving Party develops independently, which it can prove with written evidence; or (d) information that the Receiving Party is required by law or regulation to disclose.

## 17. MISCELLANEOUS

**17.1 Assignment** - The rights and/or obligations contained in this Agreement may not be assigned, delegated or otherwise transferred by either Party without the prior written approval of the other Party except that either Party may assign this Agreement to an Affiliate or if the assigning Party has a change of control or sale of all or substantially all of its assets. No assignment or delegation will relieve either Party of liability for its obligations hereunder. Any purported assignment of rights or delegation of duties in violation of this Section 16.1 is void.

**17.2 Governing Law** - This Agreement, and any disputes arising from or relating to the interpretation thereof, shall be governed by and construed under the state of Colorado law as such law applies to agreements between Colorado residents entered into and to be performed within Colorado by two residents thereof and without reference to its conflict of laws principles or the United Nations Conventions for the International Sale of Goods. Except to the extent otherwise determined by Email on Acid, any action or proceeding arising from or relating to this Agreement must be brought in a federal court or state court in Colorado and each party irrevocably submits to the jurisdiction and venue of any such court in any such action or proceeding.

**17.3 Waiver** - No failure or delay by either Party in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege hereunder.

**17.4 Severability** - In case any provision of this Agreement will be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of this Agreement will not in any way be affected or impaired thereby and the parties will begin negotiations for a replacement of the invalid, illegal or unenforceable provision.

**17.5 Relationship Between Parties** - In all matters relating to this Agreement, each Party will act as an independent contractor. Neither Party will represent that it has any authority to assume or create any obligation, express or implied, on behalf of the other Party, nor to represent the other Party as agent, employee, or in any other capacity.

**17.6 Notices** - All notices required to be sent hereunder will be in writing, sent to the addresses above with a copy to legal counsel at the same address, or to such other address as a Party may designate in writing as set forth herein, and will be deemed to have been given: (i) upon delivery, if delivered personally, by electronic mail with confirmed receipt, or if sent by facsimile with simultaneous confirmation copy; or (ii) two (2) days after the date of deposit with an internationally recognized overnight courier.

**17.7 Force Majeure** - No delay, failure, or default in performance of any obligation of either Party hereunder will constitute a breach of this Agreement to the extent caused by Force Majeure. The term "Force Majeure" will be defined to include fires, earthquakes, or other casualties or accidents, acts of God, severe weather conditions, strikes or labor disputes, war or other violence, any law, order,

Exhibit 1

proclamation, regulation, ordinance, demand, or requirement of any governmental agency, or any other event beyond the reasonable control of a Party.

**17.8 Survival** - In addition to any other terms that, by their nature survive expiration or termination, the following provisions will survive any expiration or termination of this Agreement: Sections 2 (Intellectual Property Rights);  6 (Limitation of Liability); 8.3 (Effect of Termination);  7 (Indemnity); 15 (Intellectual Property);   16 (Confidentiality);  and 17 (Misc.).

**17.9 Cumulative Rights** - All remedies, rights, undertakings, obligations and agreements contained in this Agreement will be cumulative and in addition to the respective Party's other rights and remedies available at law and/or equity.

**17.10 Counterparts** - This Agreement may be executed in one or more counterparts, each of which will be deemed an original, and all of which taken together will constitute one and the same Agreement.

**17.11 Entire Agreement** - This Agreement sets forth the entire agreement between the parties and supersedes prior proposals, agreements, and representations between them, whether written or oral relating to the subject matter of this Agreement. This Agreement may be modified only by a writing signed by an authorized representative of each Party.

**17.12 Equitable Relief** - Each of the Parties acknowledges and agrees that a breach or threatened breach by a Party of the provisions of Sections 2 (Intellectual Property Rights);  15( Intellectual Property) and/or 16 (Confidentiality) will cause irreparable damage to the non-breaching Party and in the event of such a breach, the non-breaching Party will have, in addition to any other rights it may have, the right to seek equitable relief, including injunctive relief without an obligation to prove actual damages, post bond or any other security.

**17.13 Non-Solicitation of Employees/Contractors** - As further inducement for the Parties to enter into this Agreement, no Party will, during the Term or for a period of two years following the termination or expiration of this Agreement: (a)  induce or attempt to induce, directly or indirectly, any employee of the other Party to leave his or her employment with such Party; (b) interfere, in any way, with the relationship between the other Party and its employees; or (c) induce or attempt to induce any employee, or independent contractor of the other Party to cease doing business with such Party, or in any way interfere with the relationship between any employee, or independent contractor of the other Party.  Notwithstanding the foregoing, nothing shall prevent employees or independent contractors of either Party from independently applying for a position with the other Party so long as such application was not as a result of an inducement or attempt to induce that employee to leave his/her employment with the original employer.

Exhibit 1

Licensee:

(Signature)

Email on Acid:

(Signature)

__Ryan Pfenninger_____

(Typed or Printed Name)

Title: ___CTO_____

Date: ___August 3, 2015_____

John Thies_____

(Typed or Printed Name)

Title: ____Partner_____

Date: ____June 26, 2015_____

Exhibit 1