1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLORADO

3    Civil Action No. 19-cv-03496-RMR-KLM

4

5     EMAIL ON ACID, LLC,

6          Plaintiff,

7          vs.

8     250ok, INC., and VALIDITY, INC.,

9          Defendants.

10   ----------------------------------------------------------------

11                    REPORTER'S TRANSCRIPT
                      Evidentiary Hearing
12
     ----------------------------------------------------------------
13
             Proceedings before the HONORABLE REGINA M. RODRIGUEZ,
14   Judge, United States District Court for the District of
     Colorado, commencing on the 15th day of March, 2023, in
15   Courtroom A901, United States Courthouse, Denver, Colorado.

16                         APPEARANCES

17   For the Plaintiff:
     ZACHARY C. GARTHE, Cambridge Law LLC, 4610 South Ulster St.,
18   Ste. 150, Denver, CO 80237

19   BRETT M. SCHUMAN, Goodwin Procter LLP, Three Embarcadero
     Center, San Francisco, CA 94111
20
     For the Defendant:
21   MATTHEW T. MCLAUGHLIN, Nixon Peabody LLP, 53 State St.,
     Boston, MA 02109
22
     EMILY WASSERMAN, Davis Graham & Stubbs, LLP, 1550 17th St.,
23   Ste. 500, Denver, CO 80202

24

25      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
              Denver, CO 80294, 303-335-2108
        Proceedings reported by mechanical stenography;
              transcription produced via computer.

1                          I N D E X

2

PLAINTIFF'S WITNESS                                    PAGE

3

ZACH GARTHE

4     Direct Examination By Mr. Schuman                 70
      Cross-Examination By Mr. McLaughlin               80

5


6

DEFENDANTS' WITNESSES                                  PAGE

7

MICHAEL E. HEGARTY

8     Direct Examination By Mr. McLaughlin              13
      Cross-Examination By Mr. Schuman                  20

9     Redirect Examination By Mr. McLaughlin            42
   MATTHEW MCLAUGHLIN

10    Direct Examination By Ms. Wasserman               48
      Cross-Examination By Mr. Schuman                  56

11    Redirect Examination By Ms. Wasserman             67

12

13             PLAINTIFF'S
               EXHIBITS                    RECEIVED

14
               2                              29

15
               3                              31

16

17

18

19

20

21

22

23

24

25


                    Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    3

1   *          *          *          *          *

2       (The proceedings commenced at 9:31 a.m.)

3          THE COURT:  Well, we're here this morning for an

4   evidentiary hearing in this matter, Email on Acid vs. 250ok

5   and Validity.  If we can go ahead and have entry of

6   appearances by counsel.

7          MR. SCHUMAN:  Good morning, Your Honor.  Brett

8   Schuman on behalf of the plaintiff.

9          THE COURT:  We stand up here in this courtroom,

10  please.

11         MR. SCHUMAN:  Brett Schuman on behalf of the

12  plaintiff.  My apologies.  Mr. Zach Garthe here is with me,

13  co-counsel for the plaintiff, but he's also a witness today.

14         THE COURT:  Okay.

15         MR. MCLAUGHLIN:  Good morning, Your Honor.  Matthew

16  McLaughlin on behalf of the defendants 250ok Inc. and Validity

17  Inc.

18         MS. WASSERMAN:  And Emily Wasserman.

19         THE COURT:  Thanks, everyone.  All right.  We have,

20  as I understand it, a few witnesses that will testify briefly

21  this morning.  Are there any matters preliminarily that we

22  need to take up?

23         MR. SCHUMAN:  Just two very briefly, Your Honor.

24         THE COURT:  Okay.  You'll need to go to the podium.

25         MR. SCHUMAN:  Absolutely.  So first, Your Honor, we

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    4

 1   are obviously here to conduct the evidentiary hearing, and we

 2   are prepared to proceed and just wanted to make sure for the

 3   record that the plaintiff maintains its objection to the

 4   proprietary of the evidentiary hearing.  Papers have been

 5   filed.  Your Honor has issued an order last week, which we

 6   respect, but respectfully disagree with.  So just so the

 7   record is clear, under 28 U.S.C. 652, Local Rule 16.6, and the

 8   Colorado Dispute Resolution Act, the plaintiff objects to the

 9   anticipated testimony today regarding the settlement

10   conference.

11          THE COURT:  Okay.  Your objection is noted, and I

12   have your papers on that issue.  Although I believe that my

13   order specifically indicated that this would deal with

14   nonconfidential information, and I did note that the plaintiff

15   submitted some confidential information attached to their

16   briefings.  But with that note, we will proceed.

17          MR. SCHUMAN:  The second minor housekeeping issue,

18   Your Honor, is when the lists were filed with the witnesses

19   and the exhibits on Monday per the Court's local rules --

20   procedures, excuse me -- there were some objections noted by

21   the defendants to the three exhibits the plaintiff intends to

22   use, and Mr. McLaughlin informed me shortly before the hearing

23   commenced that they're no longer maintaining those objections

24   and they stipulate to the admission of those exhibits.

25          THE COURT:  All right.  Thank you.  I appreciate

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023   5

 1   counsel's conferral on these issues to streamline things.

 2           All right.  Anything else?

 3           MR. MCLAUGHLIN:  Not from defendants, Your Honor.

 4           THE COURT:  Okay.  All right.  So we will start with

 5   defendants.  I'm going to use party names, and I'll use

 6   abbreviation of 250ok, if that's all right, to encompass both

 7   defendants, and Email on Acid as the plaintiffs.  But given

 8   this is 250ok's motion, I will allow them to start with the

 9   argument and the presentation of witnesses, okay?  Judge

10   Hegarty is on deck, I believe, to testify.  He's going to come

11   up as soon he's available, but I anticipate that will be here

12   approximately sometime between, like, 9:45 and 10 o'clock.

13           Do the parties wish to make very brief opening

14   statements?

15           MR. MCLAUGHLIN:  If Your Honor would like to hear it.

16   I know we've submitted a lot of paper on these issues --

17           THE COURT:  You have.

18           MR. MCLAUGHLIN:  -- and I don't want to repeat what

19   we've said.  We would be prepared to start with Judge Hegarty,

20   so we'd be prepared to proceed as soon as he's available.

21           THE COURT:  All right.  So I'm happy to hear brief

22   statements, no more than five minutes from each side.  Bear in

23   mind I have read the considerable amount of paper.  I've

24   thought about it.  I've looked at it.  I reviewed the cases

25   you cited to me so you do not need to repeat what you've

1   already told me, but if there is some summary or a preview of

2   how you anticipate the testimony and evidence today will come

3   out, I'm happy to hear that.

4           So with that statement, Mr. McLaughlin.

5           MR. MCLAUGHLIN:  Sure.  Thank you, Your Honor, very

6   briefly.  It is defendant's position and view that a

7   settlement agreement was reached during the settlement

8   conference presided over by Judge Hegarty.  The essential

9   terms of the dispute were resolved; payment of $1.6 million,

10  payments deadline of 90 days, dismissal of the litigation with

11  prejudice, and the scope of the release which was extended to

12  include the plaintiff's parent companies except for conduct

13  that continued after the date of the settlement that was

14  accepted from the release.  Judge Hegarty conveyed to

15  defendants that those terms were acceptable to the plaintiff.

16  We accepted those terms.

17          Thereafter the plaintiff sought to negotiate an

18  additional term, namely a forward-looking covenant not to sue

19  that has been described subsequently in the papers submitted

20  by plaintiff as a license for patents, something that was not

21  at issue in the litigation, something that does not even

22  involve the plaintiff in the litigation, Email on Acid, but

23  apparently pertains to its parent companies.  We considered

24  that additional ask.  We rejected it.  It was made clear that

25  we would not accept that, but we were ready to proceed with

1    these terms as agreed.  The defendant -- or excuse me -- the

2    plaintiff at that point attempted to renege on those

3    settlement terms.  That's why we're here.  But we think under

4    the case law the agreement that was reached, even though it

5    was verbal, is enforceable and the Court should enforce it.

6              THE COURT:  All right.  I have a question for you.

7              MR. MCLAUGHLIN:  Sure.

8              THE COURT:  Were there any other terms -- you just

9    named off three of them.  Were there any other terms that

10   contained what the parties anticipated would be a part of the

11   settlement that was reached on -- well, that you allege was

12   reached in September?

13             MR. MCLAUGHLIN:  No, Your Honor.  It was the payment

14   consideration, the timeline of the payment, the dismissal of

15   the litigation, and the release.

16             THE COURT:  And when you say the release, you're

17   referring to the language that was in the e-mail?

18             MR. MCLAUGHLIN:  It's the language in the -- as we

19   articulated in our motion.  The e-mail that was -- the e-mails

20   that were subsequently exchanged was the -- contained the

21   covenant not to sue prohibition.  It also contained -- at

22   least one version of those contained release language as well,

23   but the only thing that the parties were discussing at that

24   point was the covenant not to sue provision.

25             THE COURT:  Okay.  Well, I just want to make sure

1    it's very clear on the record here when you say the release,

2    are you talking about a release agreement as we're

3    traditionally accustomed to seeing with a settlement, or are

4    you talking about some other kind of a release?

5           MR. MCLAUGHLIN:  No, a release of claims -- a mutual

6    release of claims that I would agree is often reduced to an

7    agreement, but the terms of the release were proposed by Judge

8    Hegarty having relayed those from the plaintiff, which was it

9    would be a general release among the parties, including the

10   parent entities, Pathwire and Sinch, but it would exclude

11   conduct that occurred but continued after the date of the

12   release.  That was all the result of the concern that the

13   defendants raised when early on in the mediation Judge Hegarty

14   indicated that for the first time that we had known that these

15   two nonparties wanted to have the benefit of a release as a

16   result of this litigation even though they weren't parties.

17          We explained that that was not possible because we

18   have a commercial relationship with one of those parties.  We

19   have ongoing business dealings, and we don't know if they were

20   engaged in any misconduct.  We're not aware of any, but we

21   don't know, so we can't release claims that we don't know of.

22   We're happy to release anything that happened up until now,

23   but claims where there's conduct that's continuing, we can't

24   release those.  He communicated that to the plaintiffs,

25   reported back that they understand, this is the release that

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    9

1    they'll agree to, we accepted that.

2            THE COURT:  All right.  And it's your contention that

3    all of these discussions and all of the terms were reached on

4    the day of the settlement conference that was 9/7/2002 (sic)?

5            MR. MCLAUGHLIN:  Yes.

6            THE COURT:  Thank you.

7            MR. MCLAUGHLIN:  Thank you.

8            THE COURT:  Mr. Schuman.

9            MR. SCHUMAN:  Thank you, Your Honor.  So I'll be very

10   brief, Your Honor.  I was not at the settlement conference, as

11   Your Honor knows.  Mr. McLaughlin talked about a payment term.

12   Obviously the payment term is a material term being agreed to.

13   Your Honor, the evidence will show, and some of the evidence

14   in the record already shows, that the payment term from the

15   plaintiff's perspective was explicitly tied to this freedom to

16   operate concept, which, as it begun being drafted, was the

17   covenant not to sue.  That was always the case even heading

18   into the settlement conference.  Exhibit 1 to Mr. Garthe's

19   declaration, which was filed in November in opposition to this

20   motion, attaches the e-mail where plaintiff made clear that it

21   might even be willing to accept a lesser settlement payment in

22   exchange for freedom to operate clauses.

23           So that's been plaintiff's position since even before

24   the September 7, 2002, (sic) settlement conference.  So

25   they're tied.  And so what I think defendants want to do here

                        Sarah K. Mitchell, RPR, CRR

1   is say, well, we agreed to the payment amount, but you can't

2   uncouple or decouple that from the reason why plaintiff agreed

3   to that amount was because of the freedom to operate clauses

4   that were being discussed, negotiated, drafted during that

5   settlement conference.  Those are some of the exhibits that

6   Your Honor will see today, and --

7            THE COURT:  Well, let me ask you this question,

8   Mr. Schuman.  I mean, I understand that was the intention

9   going in, and that although you weren't there, that's your

10  understanding of the agreement.  Isn't that sort of the way

11  good mediations or settlement conferences work?  That is,

12  parties may change their positions, things may morph into

13  different things.  That is the point of a negotiated

14  agreement.  So simply because that may have been the intention

15  going in, how does that clearly demonstrate that these two

16  were necessarily continuously coupled throughout the course of

17  the negotiations?

18           MR. SCHUMAN:  Just to be clear, Your Honor, you used

19  the term the agreement, and our position is there was no

20  agreement.

21           THE COURT:  Fair enough, and I stand corrected.

22  You're correct.

23           MR. SCHUMAN:  I didn't mean to correct Your Honor.

24  Just wanted to -- you know, our position is there was no

25  agreement.  Sure, during the course of a settlement conference

19-cv-03496-RMR-KLM   Evidentiary Hearing          03/15/2023    11

1    or a mediation parties' positions can change, but what I think

2    the evidence will show when we finish the hearing today is

3    going into the settlement conference, that was clearly the

4    plaintiff's position.  There were discussions about the

5    freedom to operate concept consistently throughout the

6    settlement conference.  And then when the parties -- the only

7    thing that even begun to be drafted on September 7, 2002,

8    (sic) was the freedom to operate provisions.

9          So, yes, parties' positions can change.  No dispute

10   there.  But what I think the evidence will show here is that

11   the plaintiff never backed off or never decoupled and said,

12   yes, we'll agree to 1.6 million without consistently saying

13   that's tied to this freedom to operate concept, and then the

14   parties actually started to put pen to paper on drafting

15   versions of that language, and that's the only drafting that

16   got done, and, of course, there was no agreement on that

17   language.  That part is undisputed here.

18         The other preliminary point I'll make in the nature

19   of a brief opening statement is that's not the only source of

20   disagreement here, and I think Mr. McLaughlin -- I don't want

21   to preview too much what the witnesses are going to testify

22   to, including Mr. McLaughlin, who's a witness, and Mr. Garthe,

23   but there are other issues, Your Honor, where the parties did

24   not have any meeting of the minds with respect to the release.

25   We've talked already, and Your Honor obviously is very

1   familiar with the papers.  This freedom to operate concept,

2   the way it was being drafted was as part of a release.

3          But the freedom to operate concept, covenant not to

4   sue is really a prospective thing, and I think Your Honor

5   asked questions of Mr. McLaughlin, you know, about the more

6   traditional release that the Court typically sees in a

7   settlement.  There are issues here, factual issues where the

8   parties did not achieve a meeting of the minds even on what

9   we'll call a retrospective release of claims, you know,

10  arising prior to known, unknown, up to the date of the

11  settlement, and I think the evidence will show there was no

12  meeting of the minds on that term either, and I don't think

13  there's any dispute at all that the scope of a release is a

14  material term in order for there to be a settlement.  So I

15  think with that, unless Your Honor has any other questions,

16  we're prepared to proceed to the evidence.

17          THE COURT:  Okay.  No.  That does answer the

18  questions that I had.  All right.  Thank you.

19          MR. SCHUMAN:  Thank you.

20          THE COURT:  All right.  Right on time.  Good morning,

21  Judge .

22          JUDGE HEGARTY:  Ready?

23          THE COURT:  Yes, we're ready for you.  Perfect

24  timing.  All right.  Ms. Myhaver will swear you in.

25

Sarah K. Mitchell, RPR, CRR

```
 1                       MICHAEL E. HEGARTY

 2   was called as a witness and, having been duly sworn, was

 3   examined and testified as follows:

 4              THE COURT:  Your Honor, would you please just state

 5   your name for the record.

 6              THE WITNESS:  Michael E. Hegarty.

 7              THE COURT:  Mr. McLaughlin, you may inquire.

 8              MR. MCLAUGHLIN:  Thank you, Your Honor.

 9                       DIRECT EXAMINATION

10   BY MR. MCLAUGHLIN:

11   Q.  Good morning, Judge Hegarty.

12   A.  Good morning.

13              MR. MCLAUGHLIN:  Your Honor, out of respect for

14   everybody's time, most particularly the witness and Your

15   Honor's, I'm going to cut to the chase.

16              THE COURT:  That's a great idea.

17   Q.  (By MR. MCLAUGHLIN) Your Honor, did you conduct a

18   settlement conference in this case?

19   A.  Yes.

20   Q.  Do you recall when that was?

21   A.  September 7, 2022.

22   Q.  Do you recall who participated in that conference?

23   A.  I remember you being the principal on one side and

24   Mr. Garthe on the other.  I don't remember -- I think there

25   was maybe one other person at least in the room with each of
```

19-cv-03496-RMR-KLM   Evidentiary Hearing      03/15/2023    14

1   you, but I can't remember who that was.

2   Q.  Did you take notes --

3   A.  I did.

4   Q.  -- during the conference?  I'm sorry?

5   A.  I did take notes.

6   Q.  Have you reviewed those notes?

7   A.  I did this morning.  They contained nothing of any

8   consequence.  They're often just scribbles.  I don't write

9   terms down and those kinds of things.  It's more of a way of

10  just doing something productive with my hands while I'm

11  negotiating with the parties.  So I did look for anything that

12  might be helpful, and I found there was nothing.

13  Q.  Have you reviewed the pleadings in this case related to

14  the defendants' motion to withdraw?

15  A.  Just this morning for about five minutes.  Not related to

16  this motion.  Just to kind of refresh my memory on what the

17  whole dispute was about, because, honestly, once I'm done with

18  a case I dump it.  I did bring the copy of the e-mail, though,

19  I think that is the changed language that I probably gave

20  Mr. Garthe.  I think I initiated an e-mail to him from Hegarty

21  chambers for him to respond back to because he had a change in

22  some language, and I did bring that today in case you guys

23  didn't have that.

24  Q.  Thank you.  Could you describe just in general your

25  settlement process in this case.

                              Sarah K. Mitchell, RPR, CRR

 1   A.  Well, so I can use habit and routine because I don't

 2   remember specifically.  So my habit and routine, which I

 3   follow almost uniformly, is to have at least one session with

 4   each side apprising myself of their positions trying to weigh

 5   the strengths of their case, also getting to know them

 6   personally just to create relationship so that they can trust

 7   me when at the end of the day I advise them on what I think

 8   would be a good deal.  And I'm fairly certain that's what I

 9   did.  I probably was in each room at least four or five times.

10   And I think -- I recorded six hours for the conference in my

11   minutes.  I think it was supposed to begin at 10:30.  I don't

12   know if it did, because I often have other matters, and I

13   might get late to the settlement conference.  But it probably

14   began around 10:30 and lasted until late afternoon.

15   Q.  Do you recall whether a settlement was reached during the

16   settlement conference?

17   A.  So that probably is a legal opinion, but I will tell you

18   that my practice is, as any mediator would, to make a

19   determination at some point during the day whether there has

20   been a deal and then tell the parties, because it's fair that

21   they know we've got the deal.  They're all wanting to know

22   that.  That's why they're there in the first place.  So at

23   this conference I determined in my mind there was a deal.

24   Q.  And I just want to go through some of the components of

25   the deal.  Do you recall if the parties had reached an

Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM  Evidentiary Hearing      03/15/2023   16

1   agreement on the payment amount?

2   A.  They had -- they had reached an agreement on all material

3   terms.  I would not have told them you have a deal unless all

4   material terms were agreed, and so that's what I determined at

5   the time.

6   Q.  Okay.  And do you recall that the parties had agreed to a

7   payment by defendants of $1.6 million?

8   A.  I had recalled -- I don't recall the amount, but I would

9   not have -- and most settlements involve payment of money, and

10  this one did too.  And so whatever that payment was, that was

11  agreed to by both parties.

12  Q.  Okay.  Is the dismissal of the litigation a material term

13  that was discussed?

14  A.  Of course.

15  Q.  Okay.  What about a release between the parties?

16  A.  Yes.  There was a drafted release.  All material terms

17  were in writing, if I recall correctly.

18  Q.  Okay.  After the parties had agreed to the material terms

19  in your mind, do you recall that plaintiff -- whether

20  plaintiff sought to add an additional term to the settlement?

21  A.  Right.  So do you want to know the way it went down from

22  my perspective?

23  Q.  Yes, please.

24  A.  So they had reached an agreement on all material terms.

25  Because it was later in the year there was maybe the option of

Sarah K. Mitchell, RPR, CRR

1   the payment being -- straddling the year, so it being

2   partially in one fiscal or tax year and another tax year.

3   That was the only thing left to do.  You were making the

4   payment, and you were agreeable to whatever they wanted is my

5   recollection.  If they wanted two payments, one in 2022 and

6   2023, that was fine with you.  And if they wanted just one

7   payment, that was fine with you too.  So I just needed to

8   check with Mr. Garthe on whether his client saw any tax

9   advantage to the payments being over two years, two different

10  calendar years.  And I went into the room to see what his

11  client decided, and, in the meantime, the scope of the release

12  had fundamentally changed.

13  Q.  And do you recall how it had changed?

14  A.  Yes.  I brought the e-mail.  It went from being a logical

15  release based on the claims that were at issue to a much

16  broader release that included claims that weren't at issue in

17  this case.

18  Q.  And if I can distinguish the logical release, which was a,

19  fair to say, looking-back release?

20  A.  Correct.

21  Q.  Do you recall the parties had agreed that they would

22  generally release each other including the plaintiff's parent

23  companies?

24  A.  Right.  So my notes might -- I didn't know that would be

25  an issue.  I think my notes say both parties walk away.  That

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023   18

1    is in my notes, and I do recall that.

2    Q.  Do you recall that defendants' concern was given their

3    ongoing business relationship with the plaintiff's parent

4    entities, that they did not want to release conduct that

5    continued after the settlement?

6    A.  The concern that was only raised after the change

7    occurred?

8    Q.  Correct.

9    A.  Of course.  The reaction was visceral and fundamental when

10   I presented the new release in your room.  It was never a

11   negotiating point.  You informed me that will never happen.

12   That's impossible.  That's a fundamental change.  We don't

13   know why they're doing that.  We can't understand why they

14   would want us to waive future claims that aren't even at issue

15   in this case.

16   Q.  After you -- and did you convey our position to the

17   plaintiff on that additional term?

18   A.  I did.

19   Q.  After you conveyed defendants' position, did the

20   plaintiffs attempt to back out of the agreed-upon settlement

21   terms?

22   A.  Well, so, again, I can tell you what happened.

23   Q.  Thanks.  Please do.

24   A.  All right.

25          THE WITNESS:  And I take it, Your Honor, that there

                    Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing      03/15/2023   19

1   are no privileges involved so I can speak freely about

2   everything I heard and said?

3           THE COURT:  So my order has been that we will have

4   you testify as to what was agreed upon by the parties, but not

5   as to confidential matters that were discussed in the

6   mediation.

7           MR. MCLAUGHLIN:  Your Honor, if I could just raise

8   one issue with respect to that, and I can submit a very brief

9   bench memo on that.  The case law is clear that -- in our view

10  that terms of a settlement proposal, offers, acceptance are

11  not hearsay, not otherwise privileged and are admissible

12  testimony, and so to the extent the judge's testimony would

13  include those communications, we think that should be allowed.

14          THE COURT:  Agreed, as long as those terms were

15  communicated on both sides.  Those would not be confidential.

16          MR. MCLAUGHLIN:  Agreed.

17  A.  So Mr. Garthe's client was not willing to do anything

18  other than the changed language.

19  Q.  (By MR. MCLAUGHLIN) And do you recall that you reported

20  that position to the defendants?

21  A.  Sure.  Right.  I mean, I'm sure I told you and I told

22  Mr. Garthe that I thought there was a deal, that the

23  consequence of their actions would result in what I'm doing

24  right now.  You would probably move to enforce.  I probably

25  would have to testify.  He understood, but -- and I don't put

19-cv-03496-RMR-KLM   Evidentiary Hearing      03/15/2023    20

1   any blame on Mr. Garthe whatsoever.  He had a client who just

2   wouldn't listen.

3          MR. MCLAUGHLIN:  No further questions at this time.

4   Thank you.

5          THE COURT:  All right.  Cross-examination.

6                  CROSS-EXAMINATION

7   BY MR. SCHUMAN:

8   Q.  Good morning, Judge Hegarty.  We haven't met yet.  My name

9   is Brett Schuman, and I also represent plaintiff, Email on

10  Acid.

11  A.  Nice to meet you.

12  Q.  Yes.  And I will say that in my 26-and-a-half years this

13  is my first time examining or cross-examining a federal judge,

14  so --

15  A.  I've done it.  So I've been in this process two or three

16  times.  It happens, and I don't mind.

17  Q.  Okay.  I'm glad to hear that.  So I just have a few

18  follow-up questions for you.  You should have a very small

19  black binder in front of you with three exhibits?

20  A.  I do.

21  Q.  Okay.  I too like Mr. McLaughlin will be mindful of your

22  time and will be very efficient here.  If you would turn for

23  me, please, to the very first exhibit.

24  A.  Yes.

25  Q.  It says declaration of Zachary Garthe.  Do you see that?

                    Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM  Evidentiary Hearing  03/15/2023  21

1   A.  Yes.

2   Q.  And I presume you haven't seen the declaration itself

3   before?

4   A.  I don't think so.

5   Q.  But if you turn -- it's a short declaration, and then

6   there's Exhibit 1.  If you turn to Exhibit 1, there's an

7   e-mail from Mr. Garthe to Hegarty chambers.  Do you see that?

8   A.  Attached to the declaration?

9   Q.  Correct.

10  A.  Exhibit 1 --

11  Q.  To the declaration.

12  A.  Yes, I see that.

13  Q.  So there's a lot of redaction there.  Do you see that?

14  A.  Correct.

15  Q.  There's an unredacted portion, and that's really what I

16  want to ask you a few questions about.

17  A.  Okay.

18  Q.  First of all, is it part of your standard procedures to

19  request an e-mail like this from the parties in advance of a

20  settlement conference?

21  A.  We uniformly request settlement statements, not an e-mail

22  like this, but an integrated settlement statement that gives

23  their positions, weaknesses, strengths and everything, yes.

24  Q.  Okay.  And do you recall receiving an e-mail like that

25  from Mr. Garthe prior to this September 7, 2022, settlement

19-cv-03496-RMR-KLM    Evidentiary Hearing       03/15/2023    22

1    conference?

2    A.   I looked at my -- I called up my old e-mails today

3    searching for Zach@CopernicusLaw.com, and this e-mail was one

4    of three that popped up.  And I didn't read it this morning,

5    but I have this e-mail as a remnant in our e-mail system.

6    Q.   Okay.

7    A.   But I don't actually recall -- I mean, I hate to confess

8    this, but often I walk into a settlement conference having

9    been so busy that I haven't read the parties' positions, and

10   so I often just learn on the fly, and so I don't know if I

11   would have read this ahead of time.  It would not have been my

12   practice to do so, but I could have read it during the day.

13   Q.   Okay.  As I said, a bunch of the e-mail is redacted, and I

14   just want to read very briefly the unredacted part, draw your

15   attention to it.  Email on Acid's corporate parent Sinch AB is

16   interested in broader releases and/or freedom to operate

17   clauses between it and Validity.  Thus we would like to

18   include these clauses in our opening settlement position.  If

19   Validity is not initially open to such clauses, then we may be

20   willing to forego future royalties, paren, or an injunction,

21   closed paren, for Validity's continued use of the accused

22   technology in exchange.  Did I read that right, Judge Hegarty?

23   A.   Sure.

24   Q.   Did you have an understanding going in -- and I'm mindful

25   of your testimony a moment ago, but I want to ask you, were

1   you mindful of that being plaintiff's opening settlement

2   position going into the settlement conference?

3   A.   Do I recall it today?   No.   Every settlement is going to

4   involve some release, and I recall vaguely the discussion

5   during the day of the ability of the parties to operate

6   without worrying about being sued again, sure.   But

7   specifically -- so it's not as neat and tidy as me carrying in

8   their precise position to that side and then I'm taking their

9   precise position to their side.   I tend to negotiate

10  incrementally trying to get the easier parts done first so it

11  creates momentum for the parties.   So as I get agreement on

12  smaller parts of what their future is going to look like, then

13  they start to buy in to this thought that, hey, we may be able

14  to do something today.   So I probably would not have worked on

15  the more difficult parts which may have included the scope of

16  the release until, you know, a couple hours into the

17  negotiation.   But I just -- I have a recollection, of course,

18  since that's what blew up the settlement in the end -- was

19  that there were some discussion about the scope of the

20  release.

21  Q.   Do you remember which party you started with in terms of

22  who you met with first?

23  A.   You know, I just use my intuition.   Often I start with the

24  people I know.   I think I knew Mr. Garthe before.   I didn't

25  know Mr. McLaughlin, I don't think.   So often I start with

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    24

1   somebody I know and have dealt with before so I can get

2   comfortable with the case, and it's not unusual to start with

3   the plaintiff first so I can get the scope of the case in

4   mind.  Frankly, sometimes a party is there earlier than

5   another, and I start with that party who's there first, or it

6   varies from case to case.  I think if I came into somebody's

7   room at 10:30, that's who I was starting with because I would

8   have never started early probably.  So if either side says I

9   was there around 10:30 or 10:40, that's probably the side I

10  was probably with first.

11  Q.  Thank you.  Mr. Garthe has filed a declaration saying that

12  you came in and met with him first.  That's his testimony, not

13  yours.  Do you recall during that initial meeting with

14  Mr. Garthe -- whether it was the first meeting or whether you

15  met with defendants first, do you recall during that first

16  meeting with Mr. Garthe on September 7, 2022, asking him

17  whether he had drafted any language implementing this freedom

18  to operate concept mentioned in this e-mail, Exhibit 1?

19  A.  Well, if he had mentioned -- if he had brought up that

20  concept, I can see myself asking, you know -- one word --

21  phrase I would often use is the devil's in the details.  I

22  guess I better see -- we better see what you're thinking

23  about.  And so I can visualize that happening, but no

24  recollection specifically.

25  Q.  Okay.  When -- let's assume that that happened.  I

                        Sarah K. Mitchell, RPR, CRR

1   appreciate your testimony is you don't remember.  When you had

2   your first meeting with defendants that day, Validity and

3   Mr. McLaughlin, do you recall conveying, discussing at all

4   this freedom to operate concept that plaintiff raised in this

5   e-mail?  I appreciate you said you -- maybe you didn't read

6   it.  Let me just ask a cleaner question for the record.  Do

7   you recall during your first meeting with defendants on

8   September 7, 2022, conveying this freedom to operate concept

9   at all?

10  A.  I don't recall that.  Logically, as I see this case, the

11  two big issues would be money and release.  You know, what are

12  you guys releasing.  How can you -- if there's licenses

13  involved, how do we go about that.  So their relationship

14  going forward and the money that's going to be paid, those

15  would be the two major parts of any kind of settlement in this

16  sort of case, so it's logical, again, that I would have done

17  that.  I just don't specifically recall.

18  Q.  Okay.  Thank you for that, Judge Hegarty.  Isn't it true

19  that a little later during this settlement conference on

20  September 7, 2022, you and Mr. Garthe together worked up some

21  draft language for a covenant not to sue?

22  A.  I think so.  A covenant not to sue -- whatever -- I might

23  be wrong, but I recall there being a draft of an agreement.

24  And, of course, if there was a draft of an agreement, that

25  included multiple parts of what the parties were agreeing to,

19-cv-03496-RMR-KLM   Evidentiary Hearing      03/15/2023    26

1   then I would have probably discussed the language of that with

2   Mr. Garthe, sure.

3   Q.  This draft agreement, and I think you mentioned something

4   about this in response to Mr. McLaughlin's questions as well,

5   do you have that?

6   A.  No.  So sometimes the parties -- if it's a simple case, I

7   do material terms, but that's the basic civil rights

8   violation, employment discrimination.  In this kind of matter

9   that doesn't really work, because the parties, number one,

10  have sophisticated counsel -- well, not that the other parties

11  -- not that those other parties aren't sophisticated.  They

12  just come in and expect me to do all the work for them.  With

13  these kind of guys, they would have done a lot of that work

14  and would have had preferred language coming into the

15  mediation that they've used in other cases that are timeworn

16  for them.

17       So it would not be the case in a mediation like this

18  that I would draft anything except tweaking their language.

19  Like, if one side said I'm not sure we can agree to that, I

20  might say let me give a stab at some language and come in with

21  a draft.  But I think if there was writing here, it would have

22  initiated with either party.  I did look at my folder where I

23  keep all the settlements that I draft during the settlement

24  conference.  And I just did one yesterday.  I drafted

25  something called material terms of settlement, and the parties

Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    27

1    signed that at the end of the day because in Colorado law

2    sometimes they want writings.  So I created a writing

3    yesterday.  I did not create a writing that I know of in this

4    case because I looked in my folder, electronic folder for

5    something I would have initiated, and there was nothing there.

6    Q.   Right.  I took a note during your direct testimony with

7    Mr. McLaughlin.  You said all material terms were in writing,

8    and I'll just offer that I've never seen such a writing.

9    A.   Then I was wrong.  So I don't have a recollection.  I have

10   a recollection that all material terms were agreed on.  I

11   cannot say I have a specific recollection that there was an

12   agreement drafted.

13   Q.   Okay.  And then you also said during your direct testimony

14   that there was a drafted release.  I think you said that right

15   before you said all material terms were in writing.  Do you

16   have a copy of that drafted release?

17   A.   You know, that might be wrong too.  I mean, honestly, I do

18   about 80 of these a year.  I've done 1,300.  It is certainly

19   possible that they only orally told me what the scope of their

20   release would be and that would be a release of all claims --

21   typically it's a release of all claims that were or could have

22   been brought in this lawsuit.  That would be the standard term

23   and -- but I do not recall.  So I probably misspoke, because

24   if there is no writing, then there is no writing, and I agree

25   with that.

Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    28

1   Q.  Okay.  Judge Hegarty, Exhibit 2 in your binder is an

2   e-mail from Hegarty chambers to Zach@CopernicusLaw.com.  Are

3   you with me on Exhibit 2?

4   A.  Yes, I am.

5   Q.  I think you said you brought an e-mail with you here today

6   too.  Is it the same e-mail that we're --

7   A.  No, it is not the same e-mail.  It's about 20 minutes

8   later.

9   Q.  Okay.  We'll get to that in a minute.  Exhibit 2, does

10  this look to be an accurate copy of an e-mail from your

11  chambers to Zach@CopernicusLaw, September 7th at 2:47 p.m.?

12  A.  If you look at the electronic stamps, it looks normal,

13  ordinary, and that it came from our chambers e-mail.  I have

14  my own assigned e-mail that's to me personally, and this is

15  our chambers e-mail.  And the chambers e-mail was used with

16  the ones I brought, so it looked like I was operating through

17  the chambers e-mail, and this certainly could have been

18  something that I drafted.

19  Q.  Thank you.

20  A.  And if it came from our e-mail to Mr. Garthe, then it

21  would have been I who drafted it, not anybody else in my

22  chambers.

23  Q.  Understood.  Thank you.

24      MR. SCHUMAN:  Your Honor, I think we have a

25  stipulation, but I want to make sure to formally move

Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing       03/15/2023   29

1    Exhibit 2 into evidence for the record.

2              THE COURT:  Admitted.

3         (Plaintiff's Exhibit 2 received into evidence.)

4              MR. SCHUMAN:  Thank you.

5    Q.  (By MR. SCHUMAN) Judge Hegarty, do you have a recollection

6    of working together with Mr. Garthe on some draft language for

7    a covenant not to sue around this time?  I'm sure you don't

8    have a specific recollection of 2:47 p.m., but do you have a

9    recollection of working on some draft language for a covenant

10   not to sue with Mr. Garthe in your chambers around this time?

11   A.  Sitting in my office?

12   Q.  Yes.

13   A.  Not specifically.  I can recall him being in the

14   conference room between me and Judge Wang.  That's where he

15   was, I think, and they were in my jury room, I believe.

16   Specifically him being in my chambers, it's typical for me to

17   bring attorneys back to my computer so I can just do it right

18   there.  And so I would have no doubt if Mr. Garthe said he was

19   in my chambers that he was there and I was there with him.

20   Q.  Okay.  And appreciating this is several months ago and

21   you've done many settlement conferences since this date, do

22   you think that by 2:47 p.m. all the material terms of this

23   settlement had been agreed to?

24   A.  So what I think -- the time I don't know.  That there was

25   a moment in time, yes.  What the timing was?  It was before

19-cv-03496-RMR-KLM   Evidentiary Hearing   03/15/2023   30

1   3:08 p.m.

2   Q.   Okay.

3   A.   So it could have been around that time that I believed all

4   the terms had -- all material terms had been decided.

5   Q.   And you said 3:08 p.m. because that's the date on the next

6   e-mail?

7   A.   That's the time on the next e-mail, yeah.

8   Q.   Okay.  Exhibit 2 is an e-mail from your chambers to

9   Zach@CopernicusLaw.  Do you recall a recollection of also

10   e-mailing the language in this e-mail to defendants' counsel

11   who were at the settlement conference?

12   A.   No.  And, honestly, if Zach was back there drafting it

13   with me, I don't know why I would have e-mailed it to him only

14   unless he asked me to.  I would have done whatever he asked me

15   to do.

16   Q.   Okay.  Let's turn to Exhibit 3, Judge Hegarty, which is

17   the next e-mail.  That's the 3:08 p.m. e-mail.  Do you

18   recognize that one?

19   A.   That's the one I brought up, yes.

20   Q.   Right.  And this is an e-mail from Mr. Garthe back to you,

21   or to your chambers, excuse me, at 3:08 p.m. on the date of

22   the settlement conference, correct?

23   A.   Correct.

24         MR. SCHUMAN:  Your Honor, I move Exhibit 3 into

25   evidence.

Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing      03/15/2023    31

1              THE COURT:  Exhibit 3 is admitted.

2          (Plaintiff's Exhibit 3 received.)

3   Q.  (By MR. SCHUMAN) This is some revised language for the

4   release and covenant not to sue from Mr. Garthe to your

5   chambers, right?

6   A.  Yes.

7   Q.  Do you recall a recollection of why there was this

8   back-and-forth between your chambers to Mr. Garthe 2:47 p.m.,

9   and then Mr. Garthe back to your chambers about 20 minutes

10  later?

11  A.  I do.

12  Q.  What's that recollection?

13             THE COURT:  You may answer.

14  A.  I would have considered it a confidential communication

15  from him through his -- through his client.  Do you want me to

16  tell you?

17  Q.  (By MR. SCHUMAN) Please.  You were working on the language

18  -- we've made some objections regarding the confidentiality

19  privileges.  They're preserved for the record, but we're

20  proceeding with the evidentiary hearing.

21             THE COURT:  Well, Counsel, you need to be a little

22  careful here.  I've already indicated to you that we're not --

23  the order that I issued specifically said that we're going to

24  discuss and the judge may testify to matters that were not

25  confidential.  You're now specifically asking him to get into

                    Sarah K. Mitchell, RPR, CRR

1   confidential matters.  You may do so, but that is at your

2   peril.

3          MR. SCHUMAN:  I appreciate that, Your Honor, and I

4   didn't mean to overstep my bounds here.  I think Your Honor

5   approved Judge Hegarty answering the question.  But I do want

6   to make clear that the Exhibit 3 and the question I've asked

7   is about the release that defendants say is a material term of

8   the deal and that was agreed to.  So we are talking about

9   language for the release, which is supposedly an agreed term,

10  and so I am asking Judge Hegarty the question of why we have

11  these two e-mails 20 minutes apart regarding the release.

12         THE COURT:  All right.  You've heard Judge Hegarty's

13  testimony that he would have considered that confidential

14  information, and you are persisting in asking the question.

15  So if you are going to persist in asking the question, Judge

16  Hegarty will answer.  But, again, I've given you the caution,

17  and you persist at your peril.

18         MR. SCHUMAN:  I'm going to withdraw the question,

19  Your Honor.  I will reserve my broader objections to the

20  resolution of the confidentiality issue.

21  Q.  (By MR. SCHUMAN) So I'll withdraw that question, Judge

22  Hegarty.  Did Exhibit 3, or a version of Exhibit 3, the

23  language in Exhibit 3, go to defendants' counsel during the

24  settlement conference?

25  A.  I think I showed it to him verbatim, yes, a copy of it.

1   Q.   Okay.  And --

2   A.   Because -- to tell you why, I didn't ever practice this

3   area of law, patent trademark, intellectual property.  It's

4   not the easiest for me to assimilate.  They use terms that I

5   didn't cut my teeth on, and so I sometimes find it difficult

6   to relate from one side to the other exactly what they're

7   seeking because I don't have a fundamental knowledge of the

8   underlying law, and I think there are words that attorneys who

9   practice in this field use that have very clear meaning to one

10  another that wouldn't have that meaning to me.  So in that

11  kind of situation I often feel that I just need to have one

12  side say it plainly and bring it to the other side without me

13  conveying it orally because I don't think I could do it

14  justice.

15       So in that type of case, it's -- it would be my

16  practice to basically carry people's language to each other

17  without me being a middleman as far as rephrasing or

18  interpreting because I am concerned I would get it wrong.  So

19  I can visualize myself.  Again, if Mr. Garthe had specifically

20  language that dealt with the future use of -- somebody's

21  potential use of someone's intellectual property rights, I

22  would have asked him to just type it out, and I would take it

23  to the other side and see what they say.  So I think that's

24  what happened here.

25  Q.   And then the other side did not agree to this language,

19-cv-03496-RMR-KLM   Evidentiary Hearing      03/15/2023   34

 1    right?

 2    A.  Never.

 3    Q.  Is there some other language for a release that you

 4    brought to both parties that was agreed to?  Written language,

 5    in other words, Judge Hegarty?

 6    A.  Well, I don't know with Exhibit 2 -- I mean, honestly if

 7    that's -- I -- sitting here today I don't know.  You know,

 8    whether it was me saying this is a release of all claims that

 9    were or could have been brought, which is whether unknown --

10    known or unknown, which is what Exhibit 2 says, that's typical

11    with how I negotiate releases.  The covenant not to sue was,

12    you know, sort of unique to the intellectual property sort of

13    claims because it doesn't come up in employment -- in our

14    bread-and-butter cases like civil rights, even basic contract

15    cases.  So that's a little bit of a different term.  And if it

16    was a little bit of a different term, I can see myself

17    conveying it orally.  Whether I showed the parties Exhibit 2

18    or not, I don't recall specifically.

19    Q.  Just to be clear, Exhibit 2 includes a covenant not to sue

20    right as well, right?

21    A.  Yes.  It says that, yes.

22    Q.  I just want to make sure the record -- I want to

23    understand your best recollection on the record.  What is the

24    release -- what is the exact scope of the release that you

25    believe the parties agree to here?

                         Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing      03/15/2023   35

1   A.   Whatever it was, and I can't remember the exact scope, but

2   it wasn't what Zach brought to me at 3:08 from his client.

3   That was a fundamental change in the parties' understanding

4   throughout the day.

5   Q.   Understood.

6   A.   That I know.   There was a moment in time that was palpable

7   that was just a clear change.

8   Q.   Understood.   Going back to my prior question, though,

9   would you agree with me that the scope of what I think you

10  called a more logical release, wouldn't you agree with me that

11  the scope of that is a material term of any settlement?

12  A.   The release is a material term to any settlement.

13  Q.   Thank you.   Switching gears -- and I only have a few more

14  questions for you, Judge Hegarty.

15  A.   Sure.

16  Q.   Are you familiar with the concept of a mediator's

17  proposal?

18  A.   Do it all the time.

19  Q.   Okay.   And in your own words, what is it?

20  A.   So most of my cases involve parties -- a defendant who is

21  offering ridiculously low money at the beginning and in their

22  letter they say we'll settle this for nuisance value or 5,000

23  or $10,000.   A plaintiff comes in wanting a million or two or

24  800,000, and if you looked at that, you would say I'm not

25  going to hold a conference, but I don't really regard those

Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    36

1    things.  So I'll engage in a couple hours of talks with them,

2    and after I get a good feel for the case I apply my experience

3    in how cases -- I do all the statistics in the courthouse.  I

4    know the verdicts.  I know the outcomes.  I do most of the

5    settlements.  I know the settlements.  So I apply that

6    knowledge, and I suggest a number, usually a number.  I mean,

7    there's other terms, but often in the bread-and-butter cases

8    it's just money.  But I suggest what I think the parties

9    should do somewhere in the middle of where they are and tell

10   them that if you want a deal, this is about where it has to

11   be.  So that's what I would call from my perspective a

12   mediator's proposal.

13   Q.  And do you use the double-blind technique where --

14   A.  I use the double-blind technique.  In fact, I used it last

15   week.

16   Q.  Did you use the mediator's proposal technique in this

17   mediation on September 7, 2022?

18   A.  I don't know.  I mean, the proposal is this.  I give a

19   number to both sides.  If you say yes and the other side says

20   no, the other side doesn't know you say yes.  They'll just

21   know that they said no.  So neither side would know if the

22   other side would have taken the deal.  They'd only know if

23   they did or not.  That's what a double-blind in my view is.

24   And whether I did that here, I don't know.  If they say I did,

25   I would have no doubt, because it's a tool that I use a couple

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023     37

1    times a year in the right case.

2    Q.  Is a mediator's proposal typically done later in the day

3    as opposed to earlier?

4    A.  Correct.  I never start off a case talking about money

5    whatsoever because I don't want it to be about money.  I want

6    it to be the parties having ownership in a process.  This is

7    their day in court.  They're likely not to get a trial because

8    only one percent of cases go to trial.  I want them to feel

9    that they're being heard by a judicial officer.  So I

10   typically even in a basic case spend a couple hours just

11   talking with them and getting to know them.  I do not rush

12   into money because I don't want it to seem like this is just

13   an action, this is just about money.  That's not what I want

14   it to be about.  I want it to be about process and about the

15   parties walking away believing they were heard and that they

16   got some control over an outcome which they wouldn't otherwise

17   have potentially in a jury trial.

18   Q.  Thank you.  Do you recall -- and I think this came up a

19   little bit with Mr. McLaughlin's questions.  Do you recall at

20   some point Mr. McLaughlin's clients wanted a carveout from the

21   scope of any agreed release for claims based on conduct that

22   began before the date of the settlement but continued

23   afterwards?

24   A.  Not really.

25   Q.  You don't remember that?

Sarah K. Mitchell, RPR, CRR

1  A.  No.

2  Q.  I think if I have my notes correct on your direct

3  testimony you said you thought that Mr. McLaughlin or his

4  clients brought that up only after Mr. Garthe raised sort of

5  the new release covenant not to sue language.  Is that your

6  best recollection?

7  A.  Brought what up?

8        MR. MCLAUGHLIN:  Objection, misleads testimony.

9        THE COURT:  Restate, Counsel.

10  Q.  (By MR. SCHUMAN) Sure.  I think you talked a little bit

11  about this exception from the defendants in your direct

12  testimony.

13  A.  I don't think so.  That's the first I ever heard of it.

14  Q.  Is this the first you've ever heard of that exception,

15  then that's --

16  A.  Yeah.

17  Q.  -- fair.  Okay.  Towards the end of the settlement

18  conference on September 7, 2022, Judge Hegarty, do you

19  remember telling the defendants' counsel that there had been

20  a, quote, strange turn of events, unquote, on the plaintiff's

21  side?

22  A.  Wouldn't doubt that.

23  Q.  Do you recall saying that?

24  A.  Not strange turn of events, but that concept, yes, because

25  it was such an abrupt fundamental difference than anything we

1   had been negotiating during the day.  So I would call that

2   strange, yes.

3   Q.  Do you remember telling the defendants' counsel that

4   plaintiff's position on the covenant not to sue was in your

5   view, quote, irrational, unquote?

6   A.  Yes.  I can see that happening, because I thought it was

7   at the time.  I think it is now.

8   Q.  In the light of Exhibit 1, Judge Hegarty, the e-mail where

9   plaintiff attempted to convey to you that this was their

10  opening settlement position, that they wanted freedom to

11  operate clauses for Sinch, is it still your view that it was

12  irrational for Mr. Garthe and his clients to be asking for

13  covenants not to sue that included Sinch?

14  A.  So, I mean, to give the full answer, it would have to be

15  that in the context of the entire day I think I had pushed the

16  defendants way higher than they were willing to go at any time

17  before as far as the money.  The money, in my view, reached a

18  significant level, and that the irrational part would be if I

19  got the defendant to pay that much money, why in the world

20  would somebody insert this at the end after all that success?

21  So, yeah, I mean, I can see myself believing that.

22  Q.  Is it your typical practice to conclude a settlement

23  conference where a settlement is achieved with some sort of a

24  term sheet or going on the record and stating the terms or

25  something like that?

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    40

1    A.   Sometimes yes.  Well, it is a typical practice, but if I

2    trust the lawyers on both sides, if they're professionals, and

3    if they tell me we have a deal, then often I don't because I

4    know they'll follow through.  But because there was a decision

5    before I even got here, I think, sometime in the early 2000s

6    of the Colorado state court saying that -- I think it said

7    even when -- well, when a mediator engages in a settlement and

8    agreement is reached, it should be in writing.  So I do a

9    material terms -- I try to do a material terms.  I myself as a

10   lawyer had a plaintiff back out several times of a deal that

11   we had in front of a mediator, and I had to move to enforce a

12   settlement.

13        So the writing is important, but I will admit that on

14   certain occasions if I really trust both lawyers, have no

15   doubt about their professionalism and their commitment to

16   follow through, then I don't require it in writing.  And then

17   sometimes in the more complicated cases like this where they

18   don't want a simple material terms, but they have to have that

19   ultimate agreement that has all the broad release language and

20   every other successors assigns agents sort of language, then

21   we can't do it through, because unless one of them comes armed

22   with it on the computer and it's ready to go, that sometimes

23   takes just too much time that I can't afford to put into it.

24   So it takes hours just to tweak that language, and I leave the

25   attorneys then thereafter to do that.

                         Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing      03/15/2023   41

1  Q.  And you would agree with me there was no writing at the

2  end of this settlement conference memorializing --

3  A.  Certainly not signed, right.  I don't recall, again,

4  whether there was any writing summarizing terms, but I

5  certainly agree nobody ever signed anything.

6  Q.  And when you looked at your files prior to today's

7  testimony, you didn't even find an -- you didn't find even an

8  unsigned writing; is that correct?

9  A.  So I had my -- I mean, I can look again.  I had my staff

10  do that.  I also had them look for e-mails from Zach.  They

11  couldn't find that.  I did, because he doesn't use his last

12  name in his e-mails.  He just uses Z-a-c-h.  They were

13  probably looking for Garthe.  But I went back and looked what

14  his e-mail actually is.  I did a search and I pulled up the

15  e-mails that they couldn't find.  So I'd be happy to go back

16  and look and see if it's maybe stored under some other title

17  than what would be logical for them.  But if neither of you

18  say -- or if you say there wasn't one, I don't have any reason

19  to doubt that at all.

20  Q.  I'm just asking as we sit here today, you're not -- you

21  have not been able to find even an unsigned writing

22  memorializing the material terms?

23  A.  I haven't looked.

24  Q.  I don't have any other --

25  A.  My staff looked.  I didn't.

Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing   03/15/2023    42

1    Q.   Thank you, Judge Hegarty.

2    A.   Sure.

3              THE COURT:  Any redirect?

4              MR. MCLAUGHLIN:  Briefly, if I may, Your Honor.

5              THE COURT:  Yes.

6                         REDIRECT EXAMINATION

7    BY MR. MCLAUGHLIN:

8    Q.   Judge Hegarty, it is defendants' position that the

9    material terms were not reduced to writing but were

10   communicated verbally.  If that's the case, does that change

11   your view that the parties still reached agreement on all

12   material terms?

13   A.   No.  I think I told each side you have a deal.  I thought

14   the only thing that we're actually discussing was payment.

15   Not even amount, not even really when, just would you like it

16   in two separate payments straddling the first of the year?

17   And from my recollection, I went back in to get that answer

18   from Zach because he was going to call his client --

19   Mr. Garthe -- because he was going to call his client and see

20   if that was something that they really cared about.  I would

21   not consider that a material term because the defense had

22   agreed to pay the money.  It just wanted to know kind of do

23   they want it in installments or do they want it in a lump sum.

24   Q.   Thank you.  And even if the parties after agreeing

25   verbally to the material terms wanted to reduce those terms

                    Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    43

1   and memorialize them and include other nonmaterial terms, does

2   that change your view that the material terms that were agreed

3   to by the parties verbally are enforceable?

4   A.  I'm not going to make that -- that's Judge Rodriguez's

5   decision about whether they're enforceable or not.  There's a

6   lot of decisions that go into enforceability.  All I can say

7   is that I believe there was a settlement.  I told both sides

8   you have a deal.  I don't remember the specific terms, but

9   there was nothing material left to discuss.  Nobody had raised

10  anything remaining that was not agreed by the parties.  That's

11  all I remember.

12          MR. MCLAUGHLIN:  Thank you, Your Honor.  Nothing

13  further.

14          THE COURT:  I have just a couple of questions for

15  you, Judge Hegarty.  If there were a representation that the

16  amount of the settlement in this matter -- the purported

17  settlement in this matter was never agreed to, would you agree

18  or disagree with that?

19          THE WITNESS:  That would be almost beyond fathoming

20  for me that I would have told both sides they have a deal and

21  the money wasn't agreed on.  So in my recollection and in my

22  unerring practice, the money is such a simple term that

23  there's no ambiguity with regard to that.  It's either this or

24  that or not, and my recollection is absolutely they had agreed

25  on an amount of money.

                        Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023     44

 1          THE COURT:  All right.  And you've already indicated

 2  you've done quite a few settlement conferences, both as a

 3  practitioner and as a magistrate judge here; is that right?

 4          THE WITNESS:  Correct.

 5          THE COURT:  You're one of our most senior magistrate

 6  judges here.

 7          THE WITNESS:  The most senior magistrate judge.

 8          THE COURT:  Have you had training in conducting

 9  settlement conferences?

10          THE WITNESS:  Yes.  Do you want me to describe the

11  training?

12          THE COURT:  Sure.  You could.

13          THE WITNESS:  So I started mediating -- I started

14  being trained to mediate because people in churches were suing

15  each other, and I didn't think that was a good idea, so I took

16  a course called Peacemakers to learn how to help people

17  resolve their differences.  That was when I was an assistant

18  U.S. attorney.  Then as an assistant U.S. attorney I wanted to

19  do the collateral duty of being a mediator for employment

20  cases, and so I took collateral duty from EOUSA, was trained

21  for a week on how to mediate employment disputes, and then I

22  went around the country mediating employment disputes.

23          When I got to this court Judge Babcock was chief, but

24  Judge Nottingham was taking over.  They had created a list of

25  nine assignments to magistrate judges that the district judges

19-cv-03496-RMR-KLM   Evidentiary Hearing       03/15/2023    45

1   considered absolutely the most critical.  Number one was

2   signing warrants, because magistrate judges sign warrants

3   without district judge oversight, and those warrants can

4   deprive citizens of property and liberty interests.  So

5   district judges felt that was something that magistrate judges

6   ought to be keenly aware of how important it is to get

7   warrants correct.

8           Number two was settlement conferences.  And so I was

9   trained in baby judge school to do settlement conferences.  I

10  have been to probably two or three three- or four-day seminars

11  on training people on settlement.  I myself have taught dozens

12  of classes on settlement.  And then I have had about 1,300

13  settlement conferences myself.  So it is something I do more

14  of than anything else in this job.

15          THE COURT:  All right.  So you've testified a couple

16  of times that you don't have a specific recollection but you

17  do have your pattern and practice of how you normally operate.

18  Would the fact that someone told you in the course of the

19  mediation that the number you were discussing was beyond their

20  authority, is that something that you would recall?

21          THE WITNESS:  Beyond or below?

22          THE COURT:  Beyond, below, not within their

23  authority.

24          THE WITNESS:  If somebody told me something is not

25  within their authority, then there's no deal.  That's pretty

Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    46

1    clear.  No.  They -- they -- you know, I count on lawyers to

2    accurately present their client's position, and if they say

3    that's acceptable, I take it as bank that it's acceptable.

4    And, you know, the fact that I believe I told Mr. Garthe that

5    the inevitable consequence of what his client was doing was a

6    motion to enforce at which I'd have to testify, and I think I

7    did tell him that, tells me that undoubtedly I believed there

8    was an agreement, a meeting of the minds between all the

9    parties on all essential elements of the deal.  And like I

10   said, there was only one nonmaterial term remaining to be

11   discussed.

12          I was wrapping up.  I mean, frankly, I thought I was

13   going in for just we'll take it in one lump sum and about

14   45 days fine, and I would go back and tell the defense that,

15   and they're gone.  And so I think I spent maybe at least

16   another an hour trying to convince Mr. Garthe -- I don't think

17   I spoke directly to his client because his client wasn't

18   there.  He was speaking to his client I believe on the phone,

19   and just trying to convince him this is not good.  I mean, we

20   got to get this deal done, because we had a deal, and you've

21   just got to talk to your client.  You've got to -- I think I

22   told him things like they hire you for a reason.  They hire

23   you for your advice.  You've got to tell them that this is the

24   right thing to do.  It's what lawyers are paid to do is give

25   their clients the hard answers.  I'm sure I said things like

19-cv-03496-RMR-KLM   Evidentiary Hearing      03/15/2023    47

1   that.  I remember saying things like that.  Mr. Garthe's hands

2   were tied.  He couldn't function outside the authority of his

3   client, and it was his client who was calling the shots from

4   that moment on.

5          THE COURT:  All right.  And when you say he couldn't

6   function outside the authority of his client, you -- are you

7   referring to both in terms of the amount of the agreement and

8   then any additional terms with regard to the release other --

9          THE WITNESS:  I don't believe that question as to an

10  amount, Your Honor, whatsoever.  It was only the scope of the

11  release, and, again, you've excluded fundamentally -- I know

12  the reason.  I just can't say it because I think you've

13  excluded it.

14         THE COURT:  All right.  Any follow-up based on the

15  Court's questions?

16         MR. MCLAUGHLIN:  Nothing from defendant, Your Honor.

17         MR. SCHUMAN:  Not from the plaintiff, Your Honor.

18         THE COURT:  All right.  Thank you, Judge.  You are

19  excused.

20         Mr. McLaughlin, you may call your next witness.

21         MS. WASSERMAN:  Thank you, Your Honor.  We call

22  Mr. McLaughlin.

23         THE COURT:  All right.  Ms. Wasserman will be

24  conducting the questioning, and, Mr. McLaughlin, if you will

25  stand there.

                    Sarah K. Mitchell, RPR, CRR

 1          THE COURTROOM DEPUTY:  Please raise your right hand.

 2                      MATTHEW MCLAUGHLIN

 3  was called as a witness and, having been duly sworn, was

 4  examined and testified as follows:

 5          THE COURTROOM DEPUTY:  Please be seated.  Please

 6  state your full name for the record.

 7          THE WITNESS:  Matthew, M-a-t-t-h-e-w, McLaughlin

 8  M-c-L-a-u-g-h-l-i-n.

 9                      DIRECT EXAMINATION

10  BY MS. WASSERMAN:

11  Q.  Good morning, Mr. McLaughlin.

12  A.  Good morning.

13  Q.  Mr. McLaughlin, you just heard Judge Hegarty testify that

14  he believed the parties had reached a settlement agreement.

15  What was your understanding regarding whether the parties

16  reached a settlement agreement?

17  A.  My belief is that we did and Judge Hegarty reported to us

18  that the plaintiff had accepted all of the terms that were at

19  issue.

20  Q.  And what were the material terms of the agreement?

21  A.  The terms were that the defendants would pay $1.6 million

22  to the plaintiff.  We had requested 90 days to make that

23  payment, which Judge Hegarty reported was acceptable to the

24  plaintiff.  We agreed to dismissal of the litigation with

25  prejudice.  And we agreed to a release, a general release

19-cv-03496-RMR-KLM   Evidentiary Hearing       03/15/2023   49

1   between the parties still in litigation, which was Email on

2   Acid and -- on the plaintiff's side, and 250ok and Validity on

3   the defendants' side.  And that we would extend that release

4   to Email on Acid's parent entities, Pathwire and Sinch.  It

5   was always our position, and that's consistent with even the

6   draft release component of the e-mails, that the release would

7   not cover conduct on a going-forward basis.  It was only

8   conduct in the past.

9   Q.  Do you recall how the parties got to this agreed-upon

10  release?

11  A.  Yes.

12  Q.  Can you explain that process?

13  A.  Sure.  So we actually participated virtually from Boston

14  while Mr. Garthe was in the courtroom with Judge Hegarty.  I

15  was there with my colleague and the CEO of Validity, Mark

16  Briggs.  Mr. -- excuse me -- Judge Hegarty in his first

17  session with our side, which was about an hour after we

18  started, came into the room and didn't talk numbers, but sort

19  of talked strengths and weaknesses of the case and sort of

20  what it would take to settle.  He said that the plaintiffs

21  would be looking for a release that extended to these

22  nonparties, which was a new -- this was not something that was

23  raised in Mr. Garthe's mediation statement that he had

24  provided to us before the mediation.  It's nothing that we had

25  discussed previously, but Judge Hegarty raised that request.

19-cv-03496-RMR-KLM   Evidentiary Hearing          03/15/2023     50

1          I informed Judge Hegarty that that was not possible.

2     That we could not release -- or that we could consider

3     releasing the parent entities as long as it was clear that

4     we're only talking about conduct that had occurred in the past

5     because we had an ongoing relationship with those parent

6     entities, and we don't know what we don't know, so we're not

7     going to release any sort of future claims, whether that's

8     enforceable even if we were to.  Judge Hegarty took that

9     information.  When he came back for our second session about

10    an hour later, he said I communicated your concerns.  Email on

11    Acid is okay with not even dealing with their parent entities

12    and a release.  This can be a release between the actual

13    parties of the litigation.  That's not going to derail this.

14         During that session he presented us sort of with his

15    mediator's proposal number.  It took a while, but our client

16    agreed to the 1.6, which was the mediator's proposal.  And

17    Judge Hegarty informed us he will take that back, but he will

18    have some work to do because he understood that was below the

19    stated bottom line from the other side.  He came back for the

20    third session with us probably about an hour later than that

21    and said they will agree to the 1.6.  But for the 1.6 they do

22    want the release to extend to the parent entities, but, of

23    course, it's not going to -- it's not going to include any

24    conduct that were to continue after the date of the

25    settlement.  So you're on the same page there.  We said, okay,

Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023   51

 1  we will accept that.  Can we have 90 days to pay?  Judge said

 2  I will confirm that that's acceptable to them.  He returned

 3  shortly thereafter and confirmed they were okay with the

 4  90-day payment schedule.

 5  Q.  When was the first time you heard about the prospective

 6  covenant not to sue?

 7  A.  That was at some point after that last interaction where

 8  the judge reported they had accepted the 90-day payment term.

 9  Q.  Had it ever come up at any point before then?

10  A.  No.

11  Q.  Have you reviewed Mr. Garthe's affidavit?

12  A.  Yes.

13  Q.  In Mr. Garthe's affidavit he describes the freedom to

14  operate clause that plaintiff was seeking as a license.  Did

15  plaintiff ever mention wanting a license prior to the

16  mediation?

17  A.  No.

18  Q.  Was there ever any mention of a license during the

19  mediation?

20  A.  No.

21  Q.  Was there any mention of this concept in the mediation

22  statement that plaintiff provided to you prior to the

23  mediation?

24          THE WITNESS:  May I answer that, Your Honor?

25          THE COURT:  Yes.

                        Sarah K. Mitchell, RPR, CRR

1        THE WITNESS:  Only because it was designated

2   confidential.

3        THE COURT:  Well, it was information that was

4   disclosed to the other side.

5   A.  It was.  No.  In fact, the statement that was submitted

6   didn't mention the parent entities at all.  It only mentioned

7   payment as a resolution option, payment to Email on Acid.

8   Q.  (By MS. WASSERMAN) Did you understand at the time of the

9   mediation that when plaintiff was referring to freedom to

10  operate or covenant not to sue, what plaintiff was asking for

11  was a license?

12  A.  No.  I am not a patent attorney.  I do not do patent

13  litigation.  This case is not a patent case.  There were only

14  two claims in this case, a breach of contract claim and a

15  trade secret misappropriation claim.  So I did not understand

16  at the time that the -- colloquially a covenant not to sue can

17  be used as the equivalent to a patent license.  But even -- I

18  now understand that.  That is not what even Mr. Garthe

19  explained that they were looking for when we had a group

20  session at the end of the day on this specific language.

21  Q.  So let's actually talk a little bit about what happened

22  after plaintiff proposed this covenant not to sue.  So Judge

23  Hegarty comes in and relays that plaintiff is now seeking a

24  covenant not to sue.  Can you explain what happens next?

25  A.  Sure.  We saw it.  My client saw it and said what -- what

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    53

1   is this?  We all had the same reaction.  This is asking us not

2   to sue for the next three years?  This is not a release.  This

3   is something totally different.  I'm not sure what they're

4   asking for, why they're asking for it.  Judge Hegarty said I

5   don't know -- I don't know why.  This was -- I thought I was

6   giving you their release language.  Let me go back to them.

7   And so he left, went back.  He then at some point sent us the

8   language that -- the revised language -- I think it's

9   Exhibit 3 -- from Mr. Garthe that had both the release

10  language that was consistent with what we had agreed to and

11  still this future covenant, and we explained that still this

12  is not -- this future piece of it is not anything that we

13  would agree to.  The judge said I understand.  He then said

14  let me have Zach explain what he's trying to do here because

15  this is his language.

16        So we had a joint session where I participated along

17  with my colleague, Casey Walker, and Mark Briggs, who were all

18  in the room with me in Boston.  And Judge Hegarty was in the

19  room with Mr. Garthe.  Mr. Garthe's clients I understood were

20  available remotely.  They did not participate as far as I

21  could tell in that joint session.  During that joint session,

22  Mr. Garthe -- we -- both I and my client said why are you

23  asking us not to sue you for three years?  That makes no

24  sense.  Mr. Briggs said you're basically asking me for, as he

25  put it, a get-out-of-jail-free card so you can do whatever

                        Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023   54

1    misconduct you want to engage in for three years and we can't

2    do anything about it.  I'd be fired by my board if I agreed to

3    that.  Mr. Garthe responded that this is just me being

4    overzealous -- was his word -- for my client.  I'm just trying

5    to protect them.  I got raked over the coals -- this is his

6    word -- for this 1.6 million, and I'm just trying to protect

7    as much as I can.

8           But he said this does not -- you're not waiving your

9    right to sue.  On year three and one day, if we do engage in

10   any misconduct, you can sue us for that misconduct.  You're

11   not waiving your right to sue.  It's just a period where

12   nobody will sue each other.  So as he articulated it to us in

13   that session, it was not articulated as a license agreement of

14   any sort.  It was literally let's -- nobody will sue each

15   other for the next three years, but if anybody engages in

16   misconduct, we can sue for that misconduct after the

17   three-year period.  And neither concept was acceptable to us,

18   but any notion of not being able to pursue potential future

19   misconduct was not an acceptable solution for us.

20   Q.  How did the mediation end?

21   A.  After that joint session Judge Hegarty closed the virtual

22   joint room, told us that he wanted to speak to Mr. Garthe

23   again about this.  A while later he came back to our room and

24   said things have taken a strange turn.  Plaintiffs are acting

25   irrationally.  They are claiming that they want this -- they

1  now want this additional term of a three-year forward-looking

2  covenant not to sue or else they don't want to settle the

3  case.  I said to Judge Hegarty, well, that's a term that we've

4  never agreed to, and we already have an agreement on the

5  material terms.  I said we've agreed on the price, we've

6  agreed on the scope of the release, we've agreed on dismissal,

7  and so we have a settlement.

8          Judge Hegarty said, Do you hear me disagreeing with

9  you?  My client at that point said, I don't understand what's

10  happening here, because he's not a lawyer.  Judge Hegarty said

11  to my client, Your lawyer can explain what your remedies are

12  in this situation.  I then said to Mr. Briggs during -- in the

13  presence of Judge Hegarty, In this situation where we have

14  agreed on the material terms, I would -- my inclination would

15  be to file a motion to enforce the terms of the settlement and

16  that's what I think we will have to do here.  Judge Hegarty

17  said, Don't forget you have a conferral requirement under the

18  local rules before you do so.  And it ended at that point.

19  Q.  Why did you ultimately decide to file a motion to enforce

20  the settlement agreement?

21  A.  Again, because the parties had come to an agreement on all

22  the material terms of the dispute, and the nonparties Sinch

23  and Pathwire's efforts to add this additional term after the

24  fact in our view didn't change the fact that the parties have

25  agreed to all material terms of settlement for this dispute.

                        Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023   56

1   Q.  Does the fact that the parties don't have a signed

2   settlement agreement change your opinion in any way?

3           MR. SCHUMAN:  Objection, Your Honor.  Calls for a

4   legal conclusion.

5           MS. WASSERMAN:  Withdrawn.  No further questions.

6           THE COURT:  Cross-examination.

7           MR. SCHUMAN:  Thank you, Your Honor.

8                      CROSS-EXAMINATION

9   BY MR. SCHUMAN:

10  Q.  Mr. McLaughlin, in your direct testimony you attributed to

11  Mr. Garthe a statement this is -- in the final session.  You

12  said, This is just me being overzealous for my client.  Did I

13  take that note correctly?

14  A.  Yes.

15  Q.  You filed two declarations in this matter, right?

16  A.  Yes.

17  Q.  You didn't put that in either of your declarations, did

18  you?

19  A.  I don't believe so.

20  Q.  Why didn't you put that in the declaration?

21  A.  I was trying to limit the declaration to only the material

22  terms out of respect for the confidentiality of the mediation

23  process.

24  Q.  Mr. McLaughlin, you would agree with me that a release is

25  a material term in any settlement of a litigation, right?

                    Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing      03/15/2023   57

1   A.  Yes.

2   Q.  And therefore there has to be a meeting of the minds or an

3   agreement on the scope of the release for there to be a

4   settlement, right?

5   A.  Yes.

6   Q.  During the settlement conference on September 7, 2022, you

7   proposed that the release would except or exclude claims based

8   on conduct that began before the date of the settlement but

9   that continued after the settlement, correct?

10  A.  I'm not sure I would characterize it as an exception so

11  much as just that is -- traditionally a release only covers

12  claims that occurred up until the date of the release.

13  Q.  But you proposed -- so take out the word exception.  I

14  don't want to get hung up on characterizations.  In

15  paragraph 4, for example, of your reply declaration, you said,

16  To preserve my client's rights I requested that the scope of

17  the mutual release except ongoing conduct that began prior to

18  the settlement and continued after the settlement.  That's in

19  your declaration, right?

20  A.  I believe so.  I don't have it in front of me, but that

21  sounds right.

22  Q.  That was the scope of the release that your -- that you

23  proposed on behalf of your client, right?

24  A.  That was the scope of the release that Judge Hegarty

25  conveyed to us from plaintiff and we agreed to.

Sarah K. Mitchell, RPR, CRR

 1  Q.  Do you have your declaration in front of you,

 2  Mr. McLaughlin?

 3  A.  I don't.

 4       MR. SCHUMAN:  Your Honor, may I approach with

 5  Mr. McLaughlin's declaration?

 6       THE COURT:  Yes.  I have it.  For the record, it

 7  appears that is Document 161-1; is that right?

 8       MR. SCHUMAN:  It is, and may I give Mr. Garthe a

 9  copy?

10       THE COURT:  Yes, you may approach Ms. Myhaver.

11       MR. SCHUMAN:  I'm sorry, Mr. McLaughlin.

12  Q.  (By MR. SCHUMAN) I want to make sure we're on the same

13  page, paragraph 4 of your reply declaration, Mr. McLaughlin.

14  Are you with me?

15  A.  Yes.

16  Q.  A couple sentences down it says, Accordingly, to reserve

17  my client's rights I requested that the scope of the mutual

18  release except ongoing conduct that began prior to the

19  settlement and continued after the settlement.  Did I read

20  that right?

21  A.  You did.

22  Q.  That was your proposal.  You requested it to preserve your

23  client's rights, correct?

24  A.  Sure.

25  Q.  Okay.  And so under this proposal your clients could,

19-cv-03496-RMR-KLM   Evidentiary Hearing      03/15/2023      59

1   after a settlement, sue Email on Acid again the day after the

2   settlement for any conduct that occurred that started prior to

3   the date of the settlement, right?

4   A.  I'm not sure I -- I'm not sure I follow.  We hadn't sued

5   your client.  We hadn't sued Email on Acid.

6   Q.  Right.  I'm referring to --

7   A.  We didn't have claims against Email on Acid.

8   Q.  Sorry.  I didn't mean to talk over you.  The release that

9   would have been part of the settlement, that your client

10  claims is part of the settlement does not release claims based

11  on conduct that began prior to the settlement date and

12  continued after the settlement.  Isn't that what you proposed?

13  A.  Yes.

14  Q.  So therefore if your -- the day after the settlement was

15  signed and your client paid the money, your client could sue

16  Email on Acid for conduct that occurred prior to the date of

17  the settlement, right?

18  A.  Only if they continued engaging in that conduct after.

19  Q.  Okay.  And similarly then, Email on Acid, the day after

20  the settlement payment was made, could sue your client, 250ok

21  or Validity, for conduct that occurred prior to the date of

22  the settlement if it was ongoing after the settlement, right ?

23  A.  Potentially, yes.  That's the case with every release in

24  my view.  You're buying peace up until the date of the

25  settlement.

                        Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    60

1    Q.  But if there was conduct that occurred prior to the

2    settlement, that's not released under your -- under your --

3    the version of the release that you proposed here, right?

4    A.  No.  Only conduct that occurs after the date of the

5    settlement.

6    Q.  But if it started before.  If my client hypothetically was

7    misappropriating your client's trade secrets years before the

8    settlement, and continued doing so after the settlement, the

9    release doesn't release that conduct, right?  That was not

10   released under your version of the release?

11   A.  Agreed.

12   Q.  Okay.  Did you, Mr. McLaughlin, actually draft a release

13   containing that language at any point during the day on

14   September 7, 2022?

15   A.  No.

16   Q.  You heard Judge Hegarty's testimony obviously, and are you

17   aware of a written draft of that language prepared by anybody

18   on September 7, 2022?

19   A.  No.

20   Q.  Are you aware of any written drafts of the release

21   provision of the purported settlement other than the two

22   e-mails we looked at already with Judge Hegarty?

23   A.  The only draft -- at some point after this covenant not to

24   sue issue came up, I had started -- I or my colleague

25   Ms. Walker had started to draft bullet points of the terms,

Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing       03/15/2023    61

1   the 1.67 and the release, but that's it.

2   Q.  Was that ever shared with either Judge Hegarty or

3   Mr. Garthe on behalf of the plaintiff?

4   A.  I e-mailed it to Judge Hegarty.  I don't believe that ever

5   was shared with Mr. Garthe, as far as I'm aware.

6   Q.  Did you ever discuss -- I know there was periods of time

7   during the settlement conference where the parties were all

8   together, and of course there were periods of time when you

9   were not all together, right?

10  A.  There was only one period where we was all together that I

11  testified about a few minutes ago.

12  Q.  During that time that you were all together did you

13  propose or was there any discussion at all regarding this

14  exception for ongoing conduct that began prior to the

15  settlement and continued after the settlement?

16  A.  No, because all of -- the release component of all the

17  written language was consistent with that -- with that scope,

18  so, no, there was not.

19  Q.  Did Mr. Garthe ever tell you directly during that session

20  orally or in writing at any point that plaintiff would agree

21  to that exception from the release?

22  A.  Did Mr. Garthe tell me that?

23  Q.  Yes.

24  A.  No.  Judge Hegarty had already confirmed -- previously

25  confirmed the plaintiff had accepted that scope.

                        Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing   03/15/2023   62

1    Q.  Other than what Judge Hegarty told you, according to your

2    testimony, did you have any other evidence that plaintiff ever

3    agreed to that exception from the scope of the release?

4    A.  No.  Other than that Judge Hegarty reported that plaintiff

5    accepted that, no.

6    Q.  Mr. McLaughlin, was there any discussion during the

7    settlement conference as to whether the material terms of the

8    settlement would be confidential or not?

9    A.  No, not to my knowledge.

10   Q.  Is confidentiality of a settlement between two competitors

11   a common term of a settlement agreement in your experience?

12   A.  It can be.

13   Q.  Is it a material term of the settlement in your

14   experience?

15   A.  It can be.  It's not always.

16   Q.  Was there any agreement here regarding whether the

17   settlement that your client contends was achieved would be

18   confidential or not?

19   A.  No.  Neither party raised confidentiality as an issue.

20   Q.  So if the judge finds in response to your motion that

21   there was enforceable settlement, plaintiff here is free to

22   publicize on the Internet that your client agreed to pay

23   $1.6 million?

24   A.  I don't see any reason why they wouldn't be.

25   Q.  Okay.  You've testified in your -- both your declarations,

1  I think, and here today that it was only after the parties

2  agreed to the payment and release terms that the plaintiff

3  added or tried to add, quote, an additional term.  This is the

4  freedom to operate clause, the covenant not to sue.  Do I

5  understand your testimony correctly?

6  A.  Yes.

7  Q.  Weren't you aware, Mr. McLaughlin, that the freedom to

8  operate concept was part of plaintiff's opening settlement

9  position even prior to the commencement of the September 7,

10  2022, settlement conference?

11  A.  No.

12  Q.  Judge Hegarty didn't tell you during your initial meeting

13  with him on September 7, 2022?

14  A.  No.

15  Q.  You've since seen Mr. Garthe's declaration attaching the

16  e-mail where he communicated that to Judge Hegarty; isn't that

17  right?

18  A.  I've seen the e-mail.

19  Q.  Right.  Since -- and you've -- right.  You've seen the

20  e-mail in connection with the motion to enforce proceedings,

21  right?

22  A.  Correct.

23  Q.  That was the first time you saw it?

24  A.  It was.

25  Q.  Okay.  Well, at some point during the day on September 7,

19-cv-03496-RMR-KLM   Evidentiary Hearing       03/15/2023   64

1   2022, you did learn that plaintiff was seeking some form of

2   prospective freedom to operate type provision, right?

3   A.   I never -- it was never conveyed to me by anybody that

4   what the plaintiff was seeking was some sort of license.

5   Q.   I didn't use the term license, Mr. McLaughlin.   Freedom to

6   operate.   At some point during the day on September 7th, I

7   think it must -- perhaps when you received an e-mail from

8   Judge Hegarty with some proposed language that included a

9   covenant not to sue.   At some point during the day on

10  September 7th, you did understand that plaintiff was seeking

11  some prospective covenant not to sue as part of a settlement,

12  right?

13  A.   A covenant not to sue, yes.   When you use the phrase

14  freedom to operate, that's not a term that I use, and I don't

15  know what you mean by freedom to operate.

16  Q.   So you don't understand -- and I don't mean to be

17  pejorative in any way.   This is a question.   You don't

18  understand whether a covenant not to sue is one way to achieve

19  freedom to operate between two competitors?

20  A.   So I have since this -- these motion to enforce

21  proceedings began, I have since learned that in the patent

22  world the phrase covenant not to sue, the phrase freedom to

23  operate are understood to be actual licenses to use patented

24  technology.   At the time I did not understand that, and at the

25  time that was not what Mr. Garthe in our joint session

Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    65

1    communicated they were looking for.  He communicated that he

2    was simply looking for -- not a covenant not to sue, a

3    three-year period where nobody would sue, but they would

4    preserve their right to bring claims after that period, which

5    is not, as I understand it, consistent with the concept of a

6    freedom to operate, covenant not to sue in the patent context.

7    Q.  We're both litigators here.  I want to ask you politely to

8    just answer my questions so we can get through this, please,

9    Mr. McLaughlin.  At some point during the day you received an

10   e-mail from Judge Hegarty with some proposed language that

11   included a covenant not to sue; isn't that right?

12   A.  That's right.

13   Q.  There's a black binder in front of you.  I think it's the

14   same one Judge Hegarty had.  Exhibit 3, is that the language

15   you received?  I appreciate Exhibit 3 is an e-mail from Zach

16   Garthe to Hegarty chambers.  Did you receive from Hegarty

17   chambers that language?

18   A.  I believe so, yes.

19   Q.  Okay.  And you agree as you sit here today that you and

20   your clients did not accept what we see here in Exhibit 3;

21   isn't that right?

22   A.  We did not accept the forward-looking covenant not to sue.

23   Q.  I think I heard you testify during your direct testimony,

24   but this is a question, so please correct me if I'm wrong,

25   that the first part of Exhibit 3 is what your client did agree

19-cv-03496-RMR-KLM   Evidentiary Hearing      03/15/2023   66

1   to, right?  And let me be very specific here.  By first part

2   I'm referring to the first sentence.  That's the part that I

3   think I heard you say during your direct testimony your client

4   agreed to; is that right?

5   A.  This -- yes.  This release language drafted here is

6   consistent with the verbal scope of the release that Judge

7   Hegarty communicated to us and that we accepted, yes.  The

8   second sentence and the third sentence is beyond that.

9   Q.  I was just asking about the first sentence.

10  A.  Right.

11  Q.  I think by this point in the day it's pretty clear, but I

12  just have two other questions for you.  Isn't it true there

13  was no written term sheet prepared and signed reflecting the

14  outcome of the settlement conference?

15  A.  Correct.

16  Q.  And, in fact, there was no written record of the terms

17  even discussed during the settlement conference; isn't that

18  right?

19  A.  Well, we have detailed notes that encompass all those

20  terms, so when you say written record, we did not have a

21  signed term sheet.

22      MR. SCHUMAN:  I don't have any other questions for

23  you, Mr. McLaughlin.  Thank you.

24      MS. WASSERMAN:  Briefly, Your Honor, please?

25      THE COURT:  Yes.

Sarah K. Mitchell, RPR, CRR

1                          REDIRECT EXAMINATION

2    BY MS. WASSERMAN:

3    Q.  Mr. McLaughlin, there were a lot of questions about the

4    release and in particular what you described as an agreement

5    that the parties could sue each other for future conduct.  Can

6    you explain what the intent of the release was and kind of

7    what you were trying to achieve?

8    A.  Yes.  So it was -- it's what we had discussed with Judge

9    Hegarty when he first raised the prospect that not only the

10   plaintiff, but also its parents wanted full releases here.

11   And we said, okay, but we have ongoing relationships, and

12   we're just -- we want to make sure that, like a normal

13   release, we're only talking about a release that ends now, and

14   if there's misconduct going forward, that that's not

15   encapsulated by this release.

16   Q.  And do you believe that the language in Exhibit 3 is

17   consistent with that concept?

18            MR. SCHUMAN:  Your Honor, I'm going to object.

19   Exhibit 3 speaks for itself.  Best evidence rule.  His belief

20   as to what it reflects is not relevant or admissible.

21            THE COURT:  I think he's already said that, so I'll

22   overrule.

23   A.  Yes.  I think the first sentence of Exhibit 3 is

24   consistent with that.

25   Q.  (By MS. WASSERMAN) And what about paragraph 4 in your

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    68

1   declaration that Mr. Schuman showed you as well?

2   A.   Again, I think that is -- it's the -- that's consistent as

3   well in my view.

4   Q.   And in your view was there an agreement as to the scope of

5   that release?

6   A.   Yes.

7            MS. WASSERMAN:  No further questions.

8            THE COURT:  All right.  Just so we have it all in one

9   place and there's no doubt, what are the terms that you are

10  asking the Court to enforce if the Court does find that there

11  is an agreement?  Or said in a more succinct way, what are the

12  precise terms of this purported agreement given it's not in

13  writing?

14           THE WITNESS:  So, Your Honor, the terms would be that

15  defendants pay to plaintiff $1.6 million within 90 days of the

16  agreement, that the lawsuit would be dismissed with prejudice,

17  that the parties release -- provide a general release to each

18  other, that general release covers all claims known or unknown

19  that have been or could have been brought against one another

20  in the lawsuit, and that would extend to the parent entities

21  of plaintiff, Pathwire and Sinch.

22           THE COURT:  And is that the sentence one of Exhibit 3

23  that you're referring to?

24           THE WITNESS:  It is, Your Honor.

25           THE COURT:  All right.  Is there any other term that

                    Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM  Evidentiary Hearing  03/15/2023  69

1  was anticipated by the parties?

2          THE WITNESS:  No.

3          THE COURT:  I don't have anything else.  Any

4  questions as a follow-up to the Court's questions?

5          MS. WASSERMAN:  No, Your Honor.

6          MR. SCHUMAN:  No, Your Honor.

7          THE COURT:  All right.  Thank you.  You may step

8  down.

9          All right.  Any other witnesses?

10          MR. SCHUMAN:  Yes, Your Honor.  I'm sorry.

11          MS. WASSERMAN:  No, Your Honor.  No other witnesses

12  for defendant.

13          THE COURT:  All right.  Yes, Mr. Schuman.

14          MR. SCHUMAN:  Thank you, Your Honor.  I jumped the

15  gun a little bit.  I anticipated there were no further

16  witnesses, so we're going to call Mr. Garthe next.

17          THE COURT:  Okay.

18                    ZACH GARTHE

19  was called as a witness and, having been duly sworn, was

20  examined and testified as follows:

21          THE COURTROOM DEPUTY:  Thank you.  Please be seated.

22  Please state and spell your name for the record.

23          THE WITNESS:  My name is Zach Z-a-c-h Garthe

24  G-a-r-t-h-e.

25

                    Sarah K. Mitchell, RPR, CRR

1                          DIRECT EXAMINATION

2     BY MR. SCHUMAN:

3     Q.   Good morning, Mr. Garthe.

4     A.   Good morning.

5     Q.   You're counsel for the plaintiff in this matter, right?

6     A.   Yes, that's correct.

7     Q.   And you conducted the September 7, 2022, settlement

8     conference on behalf of the plaintiff in this matter, right?

9     A.   I did.

10    Q.   Without revealing any attorney-client privileged

11    information or work product, briefly tell the Court what you

12    did to prepare for the September 7, 2022, settlement

13    conference.

14    A.   As per Magistrate Judge Hegarty's instructions, Email on

15    Acid prepared preliminary settlement statements; one that's

16    provided to opposing side, and then one that's provided that's

17    confidential that's provided to Magistrate Judge Hegarty

18    himself.

19          THE COURT:  Mr. Garthe, I'm going to ask you to pull

20    that microphone a little bit closer.

21          THE WITNESS:  Yes, ma'am.  Sorry.

22          THE COURT:  There you go.

23    Q.   (By MR. SCHUMAN) In the binder that's in front of you,

24    Exhibit 1 is the declaration that you filed in response to

25    this motion to enforce, right?

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    71

1   A.  Yes, sir.

2   Q.  Can you confirm for the Court, please, that Exhibit 1 to

3   that declaration is a somewhat redacted version of the e-mail

4   that you sent to Judge Hegarty prior to the settlement

5   conference?

6   A.  Yes, that's correct.  This is a redacted copy of the

7   e-mail that was sent to Judge Hegarty by me according to his

8   instructions as an initial settlement statement position for

9   the settlement conference.

10  Q.  Below the header settlement information there's an

11  unredacted paragraph.  Are you with me?

12  A.  I see that.

13  Q.  The first sentence you refer to the phrase freedom to

14  operate.  I just want to ask you to explain what you meant

15  when you used that term freedom to operate in your e-mail to

16  Judge Hegarty.

17  A.  In my experience a freedom to operate clause is pretty

18  well understood and there are different ways to effectuate it,

19  but you're seeking ways for the parties involved in order to

20  continue to conduct their business without getting involved in

21  lawsuits with each other during a certain period of time.

22  Q.  And then the second sentence you say, Thus, we would like

23  to include these clauses in our opening settlement position.

24  What did you mean there?  What were you intending to convey to

25  Judge Hegarty there?

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023   72

1   A.  That's correct.  So we were intending to communicate that

2   a version of the freedom to operate clause should be included,

3   and the reason why we chose the phrase freedom to operate

4   clause was to indicate that it could be a cross licensing of

5   intellectual property, or it could be a covenant not to sue.

6   You know, different mechanisms are agreeable on our side, but

7   it was important that we have that term presented so that we

8   could get to a resolution.

9   Q.  Do you consider yourself an intellectual property

10  litigator, Mr. Garthe?

11  A.  Yes, I do.

12  Q.  Do you do trade secret cases?

13  A.  I do.

14  Q.  Patent cases?

15  A.  Yes.

16  Q.  The third sentence of this paragraph, Exhibit 1, it says,

17  If Validity is not initially open to such clauses, then we may

18  be willing to forego future royalties, paren, or an

19  injunction, closed paren, for Validity's continued use of the

20  accused technology in exchange.  What did you intend to convey

21  to Judge Hegarty by that sentence?

22  A.  Yes.  So the releases, the freedom to operate clause, that

23  is essentially two sides of the same coin with the payment

24  terms here that were at issue.  So our client has a certain

25  payment amount we were seeking.  It includes future royalties

1   or the possibility of an injunction.  What we are saying is

2   that the freedom to operate is tied to the payment amounts,

3   and so they are two sides of the same coin.  We can have some

4   give and take on each side, but they're linked.

5   Q.  So in this paragraph did you intend to convey to Judge

6   Hegarty that your client Email on Acid might be willing to

7   accept a lower settlement payment in exchange for getting the

8   freedom to operate clauses?

9   A.  Yes, that's what this says.

10  Q.  All right.  I'm going to turn to the settlement conference

11  itself now, Mr. Garthe.  During the very first session you had

12  with Judge Hegarty, did you discuss this freedom to operate

13  concept with him at all?

14  A.  Yes.  We discussed the freedom to operate concept.

15  Q.  What did you tell him?

16  A.  I described our position in the opening statement, and he

17  asked if I had prepared any written language for it.  I had

18  not at that time.

19  Q.  And did he ask you to start working on some written

20  language at that time?

21  A.  Yes, he did.

22  Q.  This is during the very first session with him?

23  A.  That's correct.

24  Q.  I think you were here for Judge Hegarty's testimony.  He

25  said it probably started around 10:30.  Approximately when do

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    74

1   you think this first meeting with him happened?

2   A.  I believe it was timely, about 10:30.

3   Q.  Did you engage in any further discussions with Judge

4   Hegarty regarding the freedom to operate concept during the

5   settlement conference September 7, 2022?

6   A.  Yes, I did.  At one point he returned back to my room, and

7   we were discussing the freedom to operate clause, discussing

8   how that term could be in theory incorporated into the broader

9   releases claim language.  Later on in the day after he

10  returned back from conference with opposing counsel, then

11  Judge Hegarty at that point presented what was -- what I

12  understood to be Validity's proposed settlement offer and --

13  which was below what we were at a position to accept.  And at

14  that point we also discussed with Judge Hegarty that plaintiff

15  would require the freedom to operate to be included.

16  Q.  Okay.  And at some point did you draft proposed language

17  for the freedom to operate concept?

18  A.  Yes, I did.

19  Q.  Did you do that on your own or did you do it together with

20  Judge Hegarty?

21  A.  My recollection on that is that we did that -- Judge

22  Hegarty and I did that in his chambers.  So we were at his

23  computer.  He pulled up some draft language from a previous

24  settlement, and I dictated terms kind of standing over his

25  shoulder as to how to edit that language so he could provide

Sarah K. Mitchell, RPR, CRR

1    that directly to the opposing side.

2    Q.  And turn to Exhibit 2 in your binder, please.

3    A.  Uh-huh.

4    Q.  Do you recognize Exhibit 2?

5    A.  I recognize this e-mail, yes.

6    Q.  What is it?

7    A.  So this is an e-mail dated September 7, 2002 -- excuse me

8    -- 2022 at 2:47 p.m.  It's from Hegarty chambers to me that

9    has initial draft language for the releases and freedom to

10   operate.

11   Q.  Is this the language that you and -- according to your

12   testimony a moment ago, is this the language that you and

13   Judge Hegarty worked up together in his chambers?

14   A.  This is one version of it.  My recollection is that there

15   was another version as well.

16   Q.  Okay.  Sticking with Exhibit 2, Mr. Garthe, did you

17   address this e-mail in your -- in the declaration that you

18   filed with this Court in response to defendants' motion to

19   enforce?  It's in your binder.

20   A.  Yes, I did address this e-mail and response during the

21   declaration, and that is at paragraph 9 here.  And as you can

22   see, there's sort of a typo here where it says that -- in the

23   declaration it says I sent the first iteration of this

24   proposal to Judge Hegarty at 2:47.  Obviously at Exhibit 2 you

25   can see that that's an e-mail from Judge Hegarty to me, and

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    76

1    that was a mistake.  I got those addresses switched while I

2    was preparing this document.  But I also want to clarify -- I

3    think the following language in this paragraph does a good job

4    of that and clarifies that at this point in the day, at the

5    time generally when I was with Judge Hegarty in his chambers

6    preparing language, that was the first time in the process

7    that we began putting any terms of any kind into writing to

8    try to understand what those would be, and my recollection --

9    this is explained here in the following sentence as well -- is

10   that there was an earlier iteration that I believe was sent

11   directly to opposing that did not include me that discussed

12   patented trade secret rights or -- and that there was a

13   conversation at some point about patents to be included, but

14   then that was revised to say -- to be limited to e-mail

15   technology.  That happened later and the point of it being

16   this was an ongoing conversation with the parties.

17   Q.  I just want to follow up on one piece of what you said

18   there.  You heard Magistrate Judge Hegarty talk about the

19   terms being in writing.  Did you ever see a draft of a release

20   that did not include a covenant not to sue component?

21   A.  No.

22   Q.  I want to go back to Exhibit 2, the e-mail from Hegarty

23   chambers to you, 2:47 p.m.  Can you explain for the Court

24   since you worked on this with Judge Hegarty what the proposal

25   was here for the release and the covenant not to sue?

                        Sarah K. Mitchell, RPR, CRR

1   A.  So as you can see with Exhibit 2, this proposal includes a

2   complete release for all claims known and unknown without

3   exception, and that release includes a covenant not to sue

4   limited to the technologies at issue between the companies,

5   e-mail related technology.  That would also be limited by the

6   parties' intellectual property rights.  So what this clause is

7   essentially trying to say, limited to three years is to

8   establish the freedom to operate for the parties as relates to

9   their products and technology of their business operations.

10  Q.  Did defendants see this language as far as you know,

11  Mr. Garthe?

12  A.  It's my understanding that they either saw this language

13  or the following Exhibit 3 language.

14  Q.  Let's turn to Exhibit 3.  Explain for the Court, please,

15  what the difference is between Exhibit 2 and Exhibit 3.

16  A.  Exhibit 3 clarifies the parties that were at issue, and

17  this was, as I recall, because Judge Hegarty wanted to ensure

18  that we were being accurate with it, and he didn't want to

19  edit or change the names of the parties, and so he asked me to

20  draft that portion.  And it includes the general global

21  release that I mentioned that has no exceptions, and that it

22  includes claims related to e-mail technology that violate

23  intellectual property rights for a period of three years.  So

24  it's the full release plus the covenant not to sue -- excuse

25  me -- plus the freedom to operate language for three years.

1   Q.  Did defendants see this language, Mr. Garthe?

2   A.  My understanding is that they did.

3   Q.  Did defendants agree to this language?

4   A.  No, they did not.

5   Q.  You can put Exhibit 3 aside.  I just have a few more

6   questions for you, Mr. Garthe.  Mr. McLaughlin's declarations

7   in connection with this motion to enforce, you read those

8   declarations, right?

9   A.  Yes, I did.

10  Q.  Those talk about a carveout or an exception from the

11  release in a purported settlement for claims based on conduct

12  beginning before the date of the settlement but continuing

13  after the settlement date.  Are you familiar with those parts

14  of his declarations?

15  A.  I'm familiar with the declarations.

16  Q.  Did plaintiff ever agree to that carveout?

17  A.  Absolutely not.  That -- to my knowledge that carveout was

18  never presented during the mediation.  It was never discussed.

19  If it had been, it certainly is not something that my clients

20  in any way would have been able to accept.

21  Q.  Mr. Garthe, you heard Mr. McLaughlin testify here today

22  for the first time that -- let me take you to the end of the

23  settlement conference now, okay?  There was a joint session,

24  right?

25  A.  That's correct.

1    Q.  Was that the only time that all the parties were at least

2    virtually together during the settlement conferences?

3    A.  I don't recall.  There may have been two joint sessions.

4    I don't recall exactly.

5    Q.  I want to focus your attention, though, on the second one,

6    the one that Mr. McLaughlin was testifying about.

7    A.  I recall.

8    Q.  During his testimony he attributed to you the statement

9    that you were just being overzealous for your client when you

10   were explaining the position you were taking.  Did you say

11   that?

12   A.  Absolutely not.

13   Q.  Okay.  Not -- well, also today, but in his declarations he

14   attributed to you the statement that you were, quote, getting

15   raked over the coals by your client.  Did you make that

16   statement during that final session where all the parties were

17   together at least virtually?

18   A.  Yes, I did.

19   Q.  What did you mean when you said that?

20   A.  The context of that particular language I think is

21   important.  So that was during the joint conference where it

22   wasn't just opposing counsel but the opposing parties'

23   principal Mr. Briggs was also there, and I was trying to

24   convince Mr. Briggs to accept the proposed language including

25   the freedom to operate terms, and so I was posturing this

1    position to say because the freedom to operate and payment

2    terms were two sides of the same coin, to say, look, you guys

3    are getting this amazing deal on the payment terms if we were

4    to accept this, and that you've got to accept the freedom to

5    operate language that goes with it, and so I was trying to

6    convey how difficult the payment terms were on our side such

7    that Mr. Briggs would understand that it was a good idea to

8    accept.

9    Q.   When you made that raked over the coals statement did you

10   intend to convey that Email on Acid had accepted $1.6 million

11   without the freedom to operate clauses?

12   A.   No, I did not.

13           MR. SCHUMAN:   I pass the witness, Your Honor.

14           THE COURT:   Thank you.   Cross-examination.

15           MR. MCLAUGHLIN:   Thank you, Your Honor.

16                        CROSS-EXAMINATION

17   BY MR. MCLAUGHLIN:

18   Q.   Good morning, Mr. Garthe.

19   A.   Good morning, Mr. McLaughlin.

20   Q.   Sinch is not a party to this litigation, correct?

21   A.   That is correct.

22   Q.   And Pathwire is not a party to this litigation, correct?

23   A.   That's correct.

24   Q.   This litigation does not involve patents, correct?

25   A.   This litigation has not asserted any patents, that's

19-cv-03496-RMR-KLM  Evidentiary Hearing     03/15/2023   81

1   correct.

2   Q.  In the lead up to the settlement conference you and I

3   spoke a number of times about settlement, correct?

4   A.  I recall during the years of this litigation that you and

5   I have had settlement conversation before.

6   Q.  Prior to the September 22 -- let's say in the four months

7   preceding the September conference, would you agree that you

8   and I had at least two separate phone calls about potential

9   settlement of this matter?

10  A.  Yes.  My recollection is that you and I spoke about trying

11  to find a settlement of this matter, and that those

12  conversations were essentially about what is going to be the

13  mediation process for a settlement.

14  Q.  Well, you made a -- you -- do you recall that we made a

15  settlement offer to you prior to the settlement conference,

16  correct?

17  A.  I recall receiving a settlement conference letter, I think

18  it was January of 2022, and that letter is what initiated the

19  series of conversations for having the settlement conference.

20  Q.  And you responded with a counterproposal in February of

21  22, didn't you?

22  A.  I would have to check.

23  Q.  At some point prior to the settlement conference do you

24  recall responding to our settlement offer with a

25  counterproposal on behalf of your client?

                        Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing      03/15/2023    82

1    A.  Sitting here today, I don't recall specifically.

2    Q.  Would you agree with me that prior to the settlement

3    conference you never raised with me in any conversation the

4    concept of a license for nonparty Sinch or Pathwire's patents

5    as a means to resolve the parties' dispute, correct?

6    A.  My recollection of our history of having conversations

7    related to settlement was that settlement conversations

8    directly addressing meaningful terms of settlement happened

9    before the acquisition of Email on Acid by Pathwire, doing

10   business as Mailgun -- or excuse me -- Mailgun doing business

11   as Pathwire, or the subsequent acquisition of Sinch.  So I

12   don't recall you and I having a phone conversation discussing

13   freedom to operate language prior to settlement, but I also

14   don't think that that is really relevant to how this

15   settlement conference was conducted.

16   Q.  When you submitted your settlement conference position

17   statement to defendants, you didn't include any reference to a

18   patent license for nonparty Sinch or Pathwire in your

19   settlement demand in your pre-settlement conference statement

20   that was provided to defendants, correct?

21   A.  I don't recall specifically what's in there.  I don't want

22   to -- I'm happy to take a look at it, but I don't -- I don't

23   recall.

24             MR. MCLAUGHLIN:  May I approach, Your Honor?

25             THE COURT:  Yes.  This is not filed, so you'll need

Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing   03/15/2023   83

1   to identify it for the record, and it should have an exhibit

2   number.

3           MR. MCLAUGHLIN:  Yes.  Could I mark this for

4   identification as Exhibit 4, and this is a document entitled

5   Email on Acid settlement position statement.

6   Q.  (By MR. MCLAUGHLIN) Are you familiar with this document,

7   Mr. Garthe?

8   A.  This document appears to be Email on Acid's settlement

9   position statement that was provided to the opposing party as

10  per Judge Hegarty's instructions for the settlement

11  conference.

12  Q.  And you can take a moment to go through, and if you can

13  tell me if in any -- on any page of this document you refer to

14  Sinch or Pathwire or a patent license or a covenant not to

15  sue.

16  A.  Just to be clear, you want me to look at every page in

17  here on this, or would you like me to just jump to the Email

18  on Acid settlement position heading on page 37?

19  Q.  Well, you drafted this, didn't you, Mr. Garthe?

20  A.  I did draft this.

21  Q.  So it's not totally unfamiliar to you what's in here?

22  A.  That's correct.

23  Q.  So however you need to review it to be able to answer my

24  question I'm fine with.

25  A.  I apologize.  I don't have a perfect memory of everything

19-cv-03496-RMR-KLM   Evidentiary Hearing      03/15/2023   84

1   that's in this document that was drafted several months ago,

2   so as to your question I would have to look at every page just

3   if you want me under oath to say it's not in here.

4           THE COURT:  Why don't you start with your settlement

5   position that's indicated in Exhibit 4.

6           THE WITNESS:  Yes, Your Honor.

7   A.  I've reviewed the section titled Email on Acid settlement

8   position.

9   Q.  (By MR. MCLAUGHLIN) And there's nothing in that section

10  related to Sinch, correct?

11  A.  There's no mention of Sinch in this section.

12  Q.  And there's no mention of Pathwire?

13  A.  That is also correct.

14  Q.  There's no mention of a patent license?

15  A.  That's correct.

16  Q.  There's no mention of a freedom to operate clause,

17  correct?

18  A.  That's correct.

19  Q.  And there's no mention of a covenant not to sue, correct?

20  A.  That's correct.

21          MR. MCLAUGHLIN:  I have nothing further, Your Honor.

22          THE COURT:  All right.  Redirect?

23          MR. SCHUMAN:  Nothing further, Your Honor.

24          THE COURT:  Sir, you've heard the testimony of Judge

25  Hegarty in this case.  You've heard Mr. McLaughlin's

                    Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM  Evidentiary Hearing      03/15/2023    85

1    testimony.  They obviously have a very different view of what

2    happened at the settlement conference on September 7th than

3    you do.  I'm just wondering if you have any explanation for

4    how, for example, Judge Hegarty is so certain there was an

5    agreement and you're so certain there was not.

6          THE WITNESS:  Your Honor, I have a great deal of

7    respect for Judge Hegarty, and I don't want to -- I disagree

8    with his recollection of the event.

9          THE COURT:  That's certain, yes.  I understand that.

10          THE WITNESS:  Judge Hegarty, as he described in

11    testimony today, had a very fluid process, and he also

12    recognized that the devil is in the details on this language,

13    and he admitted that he doesn't have a strong understanding of

14    technology-related intellectual property claims and the

15    appropriate terminology there and that he may not have ever

16    reviewed the e-mail from our position saying we wanted this

17    communicated right from the beginning.  I think that there's

18    some room that vague communications were transmitted to

19    defendants that had they been clarified or reduced to writing

20    or put on a terms sheet could have been avoided, and I think

21    that the -- I think that the defendants' side and Judge

22    Hegarty did not understand what was being discussed in terms

23    of the settlement terms.

24          THE COURT:  Okay.  Thank you.  Any further questions

25    based on the Court's questions?

                        Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM  Evidentiary Hearing       03/15/2023   86

1            MR. SCHUMAN:  No, Your Honor.

2            MR. MCLAUGHLIN:  No, Your Honor.

3            THE COURT:  All right.  Thank you, sir.  You may step

4    down.

5            THE WITNESS:  Thank you, Your Honor.

6            THE COURT:  Anything further?

7            MR. SCHUMAN:  Your Honor, may we have like five

8    minutes to just sum up what the evidence was here today just

9    like we had five minutes of openings?

10           THE COURT:  Yes.  I was going to give you that.  I

11   meant in terms of evidentiary presentation.  Is there anything

12   further?

13           MR. MCLAUGHLIN:  Nothing from defendants, Your Honor.

14           THE COURT:  Yes.  I'll give you each an opportunity

15   to summarize and make your argument.  You can certainly make

16   your legal argument at this time as well given we now have the

17   facts, the evidentiary record on which the Court will base its

18   decision.  I will reserve my comments -- I may have some

19   questions for you during the course of your presentation or

20   your argument here today.

21           All right.  Mr. McLaughlin or Ms. Wasserman, I don't

22   know who will make this argument, but the floor is yours.

23           MR. MCLAUGHLIN:  Thank you, Your Honor.  I'll be very

24   brief.  I believe the testimony that you heard today is quite

25   consistent with the position the defendants have taken in

                        Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    87

 1   their motion to enforce.  It is consistent with Judge

 2   Hegarty's recollection.  It's consistent with my recollection,

 3   and I would submit it's consistent with the documentary

 4   evidence that's been presented.  This was a trade secret and

 5   breach of contract case between Email on Acid on the one hand

 6   and 250ok and Validity on the other hand.  This was not a

 7   dispute between or involving Pathwire or Sinch, whose only

 8   role as parent entities developed late in the case.

 9          The parties during the settlement conference focused

10   on the essential elements of a settlement; the payment terms,

11   the dismissal of the lawsuit, and the release.  Those are the

12   only material terms required for this Court to consider.  The

13   dispute that's in front of this Court, which is the trade

14   secret and breach of contract case among the parties to this

15   case, Judge Hegarty was unequivocal that he believed the

16   parties had reached an agreement on all of these material

17   terms.  I would submit that my testimony supports the position

18   that it was reported by Judge Hegarty that the parties had all

19   accepted the material terms.

20          This issue of converting what was an agreed-upon

21   release, which is a standard term in settlements that governs

22   conduct predating the release, but does not extend to future

23   conduct, was clear, and the plaintiff's effort after the fact

24   to add this additional term of a future covenant not to sue I

25   would submit is classic buyer's remorse, and it's where they

                        Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023     88

 1    didn't like the deal they agreed to and they wanted more.  I

 2    don't fault them for trying to negotiate for an additional

 3    term.

 4            That happens all the time in my experience where

 5    parties agree to the material terms during a settlement

 6    discussion or mediation, and the parties thereafter reduce

 7    that agreement to writing, and of course there are additional

 8    terms that a party may want to put in there, confidentiality,

 9    non-disparagement, what have you, and those are negotiated as

10    well.  And if the parties can agree on those additional terms,

11    those get inserted in.  If they can't, they don't make it in.

12    It doesn't change the fact that the core material terms that

13    were agreed to are binding and enforceable on the parties.

14    And that's what we have here.

15            Plaintiffs want this additional term.  I think it was

16    abundantly clear that it was not a term -- or a concept that

17    was important enough for plaintiff to put in their position

18    statement to defendants for the defendants to consider in the

19    lead-up to the settlement conference.  It was not, according

20    to the testimony you heard, something that was discussed

21    during the course of the mediation at all until after all of

22    the material terms between the parties to the suit were

23    resolved.  This was an after-the-fact attempt.  And I would

24    submit the attempt now to style this as a license, a patent

25    license and that that's what was on the table is totally

                    Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM  Evidentiary Hearing  03/15/2023  89

1  inconsistent with Mr. Garthe's explanation during the

2  mediation that this is just a standstill, that Validity could

3  turn around and sue for any breach during that three-year

4  period after the three-year period runs out.

5       That does not seem to be what plaintiff's position is

6  in their written papers where they are trying to convey that

7  this covenant not to sue was, in fact, a patent license.  That

8  was never discussed.  It was never negotiated, and it was

9  never something that was part of the material terms, and so I

10  think the Court has more than sufficient evidence to find that

11  an enforceable settlement was reached here, the material terms

12  of which are those that I testified to, and the Court should

13  do so.

14       THE COURT:  All right.  One question for you.  Was

15  the inclusion of Mailgun Technologies or the parent company

16  Pathwire, was that included in the material terms or was that

17  added later?  Is that part of what you believe was the

18  ultimate agreement?

19       MR. MCLAUGHLIN:  They were included.

20       THE COURT:  All right.

21       MR. MCLAUGHLIN:  Yes.

22       THE COURT:  All right.

23       MR. MCLAUGHLIN:  Thank you, Your Honor.

24       MR. SCHUMAN:  I too will be brief, and I thank the

25  Court for its time today.  I'm going to return to basically

19-cv-03496-RMR-KLM   Evidentiary Hearing    03/15/2023    90

1   the same three points I started with in my very -- in the

2   openings that Your Honor invited us to give.  First, the

3   evidence clearly shows that the payment term in the

4   plaintiff's mind was explicitly tied to this premium to

5   operate concept.  Exhibit 1 to Mr. Garthe's declaration,

6   Mr. Garthe's testimony confirms that.  We heard Judge Hegarty

7   say he may not have read that, but that doesn't take away the

8   fact that it was plaintiff's position going in.

9        We also have heard just very recently that that

10  position was not in the settlement conference statement shared

11  with the defendants.  I would submit that's irrelevant.

12  Parties all the time commit -- communicate privately to the

13  settlement master or mediator things that they do not

14  communicate in advance to the other side.  It's undisputed it

15  was communicated to Judge Hegarty.  I guess what is disputed

16  or ambiguous following the testimony today is whether Judge

17  Hegarty grasped that or read that going into the settlement

18  conference.

19        THE COURT:  But isn't it the responsibility of the

20  lawyer in these negotiations to ensure that the terms that he

21  or she is negotiating are clear?

22        MR. SCHUMAN:  I agree with that, and what the

23  evidence shows -- Mr. Garthe's testimony is from the very

24  first session with Judge Hegarty.  Judge Hegarty testified he

25  couldn't remember, which is fair.  He does -- I think he said

Sarah K. Mitchell, RPR, CRR

1    he did 1,300 settlement conferences.  Mr. Garthe has a clear

2    recollection and testified very clearly that from the very

3    first session with Judge Hegarty this was discussed and that

4    Judge Hegarty asked Mr. Garthe to start drafting language.  So

5    yes, it is.  I agree with Your Honor.  And just like I agreed

6    with Your Honor's point that you asked me during the opening,

7    isn't it possible that parties' positions can change during a

8    settlement conference?  Yes, it is.

9            But the evidence here, Your Honor, shows that going

10   into the conference from the first session with Magistrate

11   Judge Hegarty, the second session, then Mr. Garthe testified,

12   and Judge Hegarty testified not inconsistently, that they

13   drafted this language together at 2:47 p.m.  The conference

14   started at 10:30 or 10:40 maybe.  It was discussed

15   consistently, and it was drafted.  So I would submit to Your

16   Honor the evidence shows that, yes, Mr. Garthe did

17   consistently raise the freedom to operate concept with Judge

18   Hegarty.

19           I do think we heard from Judge Hegarty one possible

20   explanation for what happened here which is his general

21   practice is to kind of try to get the easier issues out of the

22   way first and tougher ones for later.  And I think what the

23   evidence here shows is that prospective covenant not to sue --

24   we haven't used the term license.  That's Mr. McLaughlin.  But

25   I would agree that they're roughly similar.  This covenant not

1    to sue might have been considered by Judge Hegarty to be on

2    the side of the ledger that maybe was a tougher issue, and he

3    may have put that towards the back end and worked on the --

4    I'm arguing here.  I'm interpreting.

5         The testimony he gave was he didn't remember, but

6    that his general practice is to try to work on the easier

7    issues first.  Payment terms, we heard him talk about payment

8    term.  So what might have happened is this issue got kicked

9    down the road by Judge Hegarty.  But to Your Honor's question,

10   Mr. Garthe raised it before, during the first session, and

11   then they drafted all throughout the day language that was not

12   agreed on.

13        THE COURT:  Well, what I'm wondering about, though,

14   is -- I don't know that I can put my finger on it exactly

15   right now, but as I understand it from your papers, plaintiff

16   is challenging every contention by the defendant that there

17   was an agreement.  They say there was no mediator proposal.

18   There was no agreement to a payment term.  There was no

19   agreement to the scope of the releases.  There was no

20   agreement as to the amount.  I can hear your argument with

21   regard to this freedom to operate provision, but I -- it's a

22   little more of a struggle to understand how you argue that

23   everybody else other than Mr. Garthe got all of this so wrong,

24   and so that's what I'm struggling with a little bit here.

25        MR. SCHUMAN:  I want to try to answer that, Your

1    Honor.

2           THE COURT:  Please.  I'd like you to.

3           MR. SCHUMAN:  With respect to the mediator's

4    proposal, I asked Judge Hegarty about this, as you heard.

5    That's a term of art.  That's a process, and Your Honor is

6    probably familiar with it.  At least as it was put in

7    Mr. McLaughlin's declarations that there was a mediator's

8    proposal, that that technique was used here.  Mr. Garthe said

9    it wasn't, and I believe Judge Hegarty didn't say whether it

10   was or wasn't.  He didn't have a recollection.

11          With respect to the payment term itself, we're not

12   disputing that the number was 1.6 million.  The reason why we

13   are disputing it is because of the evidence you heard today

14   and in the declarations.  That number does not exist in

15   isolation from the freedom to operate clauses.  As I think

16   Mr. Garthe said, I don't know what did he say, two sides of

17   the same coin.  These were related.  So you can't decouple

18   them and just say we agreed on a payment term 1.6.

19   Plaintiff's position throughout was the money term was tied to

20   the freedom to operate clauses.

21          So if Your Honor is to order that there was a

22   settlement, I would submit that you can't decouple those

23   things.  So when you say -- when you asked me are we disputing

24   everything including the amount, we're not disputing that the

25   parties had agreed on a number, but the evidence shows that

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023   94

1   that number was always, including during this sort of midday

2   session when this was -- this number was presented to

3   Mr. Garthe on behalf of the plaintiffs, that very conversation

4   included as long as we get the freedom to operate clauses.

5          So if Your Honor is to order a settlement, or confirm

6   that there was a settlement and write something, it's the

7   1.6 million, but with the freedom to operate language that the

8   defendants resist so strenuously.  So that's the explanation

9   for why Your Honor thinks that every term is disputed.

10  There's only a couple material terms here, as we heard today.

11  The parties didn't talk about confidentiality.

12  Confidentiality could be a material term.  Apparently here to

13  these parties it wasn't.  But what we do know from

14  Mr. McLaughlin is obviously a release is a material term.  I

15  think Judge Hegarty said that as well.  And payment is a

16  material term, and here the payment was tied to these freedom

17  to operate clauses.

18         THE COURT:  You say that, but, I mean, the judge was

19  pretty clear on that issue.

20         MR. SCHUMAN:  I think the record -- we have a

21  transcript, and we're both sitting here live, and I don't want

22  to disagree with Your Honor's impression of what he said.  I

23  think he said he didn't remember a lot except for this sort of

24  pivotal point in time where he thought there was a change

25  somewhere between 2:37 and 3:08 p.m.

Sarah K. Mitchell, RPR, CRR

1          THE COURT:  I agree with that, but I thought I also

2    heard him say words to the effect of there was no question in

3    my mind that all the material terms of the settlement had been

4    agreed to.  To use his words, there was a deal.  And you heard

5    me ask him follow-up questions about the amount, and he was

6    very clear about that.  That's why I wanted to make sure that

7    I understood what he was saying.  Did you understand it

8    differently, what he was saying?

9          MR. SCHUMAN:  No.  I understood him to say what Your

10   Honor has said, and I think what he has -- I have -- as

11   everybody here has said, I have tremendous respect for him and

12   his experience.  I think he has glossed over that from the

13   plaintiff's perspective, from the e-mail prior to the

14   settlement conference and through the meetings that he does

15   not specifically remember, the payment term, which in his view

16   is one of those material terms, there was a deal, it was

17   always tied to the freedom to operate, covenant not to sue

18   that he was working on, asked Mr. Garthe to write, was working

19   on consistently throughout the day.  I think that's just being

20   glossed over.

21          I want to answer all of your questions, but I do want

22   to turn to the final point, because I did preview this in the

23   opening remarks.  I think wholly apart, Your Honor, from

24   whether there's a prospective covenant not to sue that's a

25   material term or part of any settlement here, there is a lack

19-cv-03496-RMR-KLM   Evidentiary Hearing      03/15/2023   96

1   of meeting of the minds and a fundamental disagreement

2   regarding what I think Judge Hegarty referred to as the more

3   logical release and what I think Mr. McLaughlin characterized

4   as the retroactive or retrospective release.

5         There is a fundamental disconnect in the evidence

6   that you heard today because this exception or this carveout

7   for continuing conduct that is set forth in paragraph 4 -- I'm

8   sorry, it's paragraph 8 of Mr. McLaughlin's original

9   declaration and paragraph 4 of his reply declaration.  He says

10   that the term that was agreed to includes an exception for

11   claims arising from conduct or circumstances that commenced

12   prior to but continued after such date.

13         Two points.  Mr. Garthe has said in his declaration

14   and on the stand, I never heard that exception.  I never

15   agreed to it.  I couldn't have agreed to it.  Point one.

16   Point two, that is inconsistent and not included -- that

17   exception is not in the language of Exhibit 3, the first part,

18   which is what we heard today from Mr. McLaughlin is what his

19   client agreed to for the release.  And I think Your Honor just

20   a few moments ago asked him very clearly so we have it in one

21   place what are the terms, and he said it's the first part of

22   Exhibit 3.  The exception that his declarations say is part of

23   the agreed release is not there.

24         So putting aside any disputes around -- and you heard

25   me ask Judge Hegarty about this as well, and I -- I thought he

Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    97

1     said on his direct testimony, and I'm not going to interpret

2     what was said, the transcript will speak, but I obviously

3     thought he said that that came up later.  And then on cross

4     when I asked him about it he said, oh, no, I didn't talk about

5     that at all.  I'm not aware of that at all.  Whatever the

6     record says, it says.

7             But I think if Your Honor is being asked to find

8     whether there was a settlement, a release is a material term.

9     I think that's undisputed here.  And there is not even

10    agreement, meeting of the minds regarding what the language of

11    the release is.  We know it was never committed to writing

12    that was shared or signed.  And just on the face of the

13    defendants' own showing -- we haven't talked about the burden

14    of proof here, but it's their motion.  They're trying to

15    establish there was a settlement.  I think they probably have

16    some burden of proof.  Mr. McLaughlin's declarations are

17    inconsistent with the language that they are asking you to put

18    in the release.  Unless you have any other questions, Your

19    Honor, I'm prepared to sit down.

20            THE COURT:  No.  I don't have any further questions.

21    Thank you.

22            MR. SCHUMAN:  Thank you, Your Honor.

23            THE COURT:  All right.  I will tell you that this

24    issue I view as a challenging and thorny one.  Both counsel

25    have done a good job of raising issues and pointing to where

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    98

1    there are challenges here.  I do believe that Magistrate Judge

2    Hegarty's testimony is quite clear.  However, there are a

3    number of other issues that the Court needs to consider, and

4    therefore I will take this under advisement and issue a

5    written order, and I will try to get that out pretty quickly

6    here.  I will note this is a very old case.  It goes back to

7    2019.  We're coming up on, gosh, we're in the fourth year of

8    this thing, give or take some months.

9         The purported reason for having the settlement

10   conference in the first place and to the extent there was any

11   agreement by one side or the other or not agreement or

12   whatever, it was all precipitated by a desire to avoid further

13   litigation and expenses and allow the business people of this

14   case to get back to actually the business.  That makes money

15   for their companies.  Litigation does not.  That's a simple

16   equation.  Where we find ourselves now is exactly not that and

17   having exacerbated the situation that was already challenging

18   months ago when this settlement occurred.

19        It occurs to me -- this is just one judge's

20   observation here -- that this is somewhat of a difficult

21   errand that we have all embarked upon.  For me, it's my job.

22   I will rule on these things.  That's what we do.  And if we

23   need to have a trial, we will have a trial.  I think that I've

24   demonstrated since I've been on the bench I'm perfectly

25   willing to try cases.  We've tried a lot of them since I've

                      Sarah K. Mitchell, RPR, CRR

1    been here.  My first one was after three weeks on the job.  So

2    we will try this case.  And you can be assured this case is

3    old.  It's not going to get older on my watch past this year.

4    So if we are going to try it, it will get tried this year.

5           But that being said, irrespective of how the Court

6    rules on this, it doesn't end things, right?  Even if I rule

7    that there was a settlement and then we enter judgment, this

8    goes up on appeal.  You're looking at another year and a half.

9    That's lawyers' fees, that's time, that's energy, that's

10   uncertainty with regard to this.  And this issue about the

11   freedom clause still isn't resolved, so the parties are still

12   in many ways flapping in the wind on these issues.

13          If I rule that there was no agreement, we're going to

14   be right back into the discovery, and we're going to be

15   looking right back at the litigation and ultimately trial in

16   this matter.  It seems to me that smart lawyers who are

17   advisors as well as litigators can figure this out.  I realize

18   that there is a line that's been drawn in the sand on which

19   both sides have said they cannot cross.  But at some point

20   those lines are going to get crossed, and if we go to trial,

21   even then it's not over because there will be appeals, there

22   will be challenges, there will be on and on and on.

23          I'm not telling you anything you don't know.  It is

24   unfortunate that you don't have your clients here for this,

25   because they are the people that need to be making these

19-cv-03496-RMR-KLM   Evidentiary Hearing       03/15/2023     100

 1    decisions and understand fully the scope of what this issue

 2    is.  Some of it's legal, some of it's factual, and ultimately

 3    the Court's going to have to make the best determination it

 4    can.  But in some ways you're asking me as the plaintiffs to

 5    make a finding that a very experienced magistrate judge, the

 6    most senior one on this court and one of the best mediation

 7    judges, simply didn't understand, and that's why this thing

 8    got into a mess.  On the other hand, on the other side you're

 9    asking me to find terms and certainty as to terms that aren't

10    written out, and there's a dispute about them.  A factual

11    dispute.  And I'm going to have to resolve that.

12           Either way, those are difficult choices.  And either

13    way, it's not perfect.  As I said, that's what I was -- took

14    an oath to do.  That's what I ought to do, and I will do it.

15    But I don't know how much that helps either one of you at the

16    end of the day.  It takes it completely out of your control

17    and puts it in the Court's control.  Once you hand it to the

18    jury, it's out of your hand again.  Litigation expenses are

19    out of control.  It seems to me the wiser approach here is to

20    sit down and figure out a way forward, particularly given that

21    the parties are still in relationship.  Actually not the

22    parties.  Actually the parent company and the defendant still

23    have a business relationship.  Is that still the case?

24           MR. MCLAUGHLIN:  I believe that they are a customer.

25           THE COURT:  Again, it's disappointing that the

                       Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023    101

1    clients aren't here, because they would be able to answer that

2    question, and they're really the ones that need to decide

3    these issues.  Do you really want to fight with your customer?

4    Do you really want to fight with your supplier?  Those are

5    really questions.  Do you really want to spend the millions of

6    dollars it's going to take to get through this, and they may

7    not care so much about the money, although these days it seems

8    like money is a big deal for everybody, they may care more

9    about the time, the energy that's going to be expended in all

10   this.  So, again, you all are smart lawyers.  You're

11   experienced lawyers.  I'm not telling you anything you don't

12   know, but your clients need to understand this.

13          So with all of that, I will tell you I'm going to

14   take all this under advisement.  Again, we will issue an order

15   as quickly as possible.  A lot of dominos start to fall once I

16   issue the order.  So if you're going to sit down with your

17   clients, if you're going to sit down with one another, I would

18   urge you to do it quickly, because now is the time.  There are

19   always high watermarks in the course of litigation where you

20   have the best opportunity for a resolution if you are inclined

21   to reach one.  This I would urge you is one of those high

22   watermarks, and now is the time.

23          To the extent the parties need assistance on that

24   front, I do believe that we have the resources of the circuit

25   mediation group that may be willing to help if you need a

Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing       03/15/2023    102

 1    mediator.  But you also have the opportunity to hire private

 2    mediators.  I will also tell you that you have now gotten

 3    Magistrate Judge Hegarty recused in this case.  He has recused

 4    himself.  So you no longer have somebody that is familiar with

 5    your case and the discovery that has gone on in this case.  So

 6    there will be time and expense getting a new magistrate judge

 7    up to speed on this matter.  It is highly possible that I may

 8    decide not to refer the discovery issues or any of the other

 9    issues in this case to a magistrate judge so as not to burden

10    an additional magistrate judge with getting up to speed on

11    this case.

12            I will not pretend that I am fully up to speed on all

13    the discovery issues and the substantive issues in this case.

14    I do have some experience with trade secret and

15    misappropriation cases having tried some myself.  But all that

16    being said, I do not have the background that Judge Hegarty

17    has and will have to bring myself up to speed, but we are

18    short on magistrate judges, and we are trying to get some of

19    those vacancies filled, but until we get them, those

20    magistrate judges are already working at high speed and high

21    octane at this time.  So it might be that I retain this in

22    order to keep it moving.  Again, we also need to be thinking

23    that we will get this tried before the end of the year.

24            The other thing that this Court has to carefully

25    weigh is that was not a settlement conference or mediation

                        Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing        03/15/2023   103

 1   that occurred in the context of private mediation.  You all

 2   were before a federal judicial officer.  I view that

 3   differently than a private mediation, and I think I made that

 4   clear in my order with regard to allowing the testimony of the

 5   judge in this case.  But I also have to think about not only

 6   the just and speedy resolution of this matter, but also this

 7   court and proceedings that occur before judicial officers of

 8   this court.  So you can see I have given this a great deal of

 9   thought.  I will not say that I have come to a fast conclusion

10   on this.  But I will in short order.

11        So with all that being said, is there anything

12   further that we can do for the good of the order today?

13        MR. SCHUMAN:  Nothing from plaintiff, Your Honor, and

14   I appreciate your time and your comments.

15        MR. MCLAUGHLIN:  Nothing from defendant, and thank

16   you, Your Honor.

17        THE COURT:  All right.  Well, I wish you Godspeed.  I

18   suggest you take the time while everybody's here, this is all

19   fresh in your minds, to sit down and chat.  It's lunchtime.

20   Buy each other a lunch.  Maybe a drink or two.  I don't know

21   when you have to get flights or whatever you've got to get,

22   but I would suggest you've got some time, you've got some

23   momentum behind you, everything is fresh.  Sit down and figure

24   this out and talk to your clients candidly.

25        If for some stroke of magic here you reach a

                    Sarah K. Mitchell, RPR, CRR

19-cv-03496-RMR-KLM   Evidentiary Hearing      03/15/2023    104

1    resolution, please notify us immediately, or if you think that

2    something is imminent.  We have a lot of other cases we have

3    to get to.  This is on the top of my priority list to get a

4    resolution on since it does not seem that it is getting better

5    with time.  So I will do my best to get a resolution for you,

6    but let me know if you are on the path to resolving it

7    yourself.  Particularly in business disputes I always think

8    that the businesspeople's resolution is better than the

9    Court's.  With that, we'll be in recess.

10             THE COURTROOM DEPUTY:  All rise.

11        (The proceedings were concluded at 12:04 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR

1                        REPORTER'S CERTIFICATE

2

3           I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10          Dated this 2nd day of April, 2023.

11

12

13

14            _____/s/ Sarah K. Mitchell_____

15               SARAH K. MITCHELL
                 Official Court Reporter
16          Registered Professional Reporter
                Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR